# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re ALLIANZ DRESDNER MUTUAL FUNDS FEE LITIGATION | ) ) ) ) | MASTER FILE: 3:04cv280 (CFD) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | | Dated: November 3, 2004 |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, media reports, news articles, academic literature and academic studies. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal class action based upon Allianz Dresdner Asset Management of America L.P. ("ADAM of America"), and those of its subsidiaries and affiliates also named herein as defendants, (collectively, "Defendants") charging investors in Defendants' mutual funds  ("Defendants' Funds" or "Funds") excessive fees and expenses that they then used, in part, to improperly pay and induce brokers to steer more investors into Defendants' Funds.  As a result of their material omissions and conduct detailed below, Defendants are liable under the Investment Company Act of 1940 (the "Investment Company Act"); the Investment Advisers Act of 1940 (the "Investment Advisers Act"); Connecticut Unfair Trade Practices Act ("CUTPA"); unjust enrichment; and for breaches of their common law fiduciary duties to a class (the "Class") of all persons or entities who held one or more shares of Defendants' Funds, set

forth in Exhibit A attached hereto, during the period February 17, 1999 to November 17, 2003 (the "Class Period").

2.      Defendants participated in "shelf-space programs" whereby they made undisclosed and improper payments to brokerages including Morgan Stanley DW Inc. ("Morgan Stanley"), Salomon Smith Barney ("Smith Barney"), Merrill Lynch, Wachovia and AG Edwards, to induce them to direct investors into the Defendants' Funds.  Then, once invested in the Defendants' Funds, investors were charged and paid undisclosed fees to Defendants that were improperly used by the Defendants to pay brokers to push the Defendants' Funds on still more investors in order to increase the level of investments in the Defendants' Funds.

3.      Defendants' practice of charging excessive fees and commissions to the Defendants' Funds investors to pay and induce brokers to steer investors into the Defendants' Funds necessarily created insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but, in fact, were only concerned with their pay-offs from Defendants.

4.      Defendants' improper conduct has been the focus of several regulatory investigations that have resulted in the fine and censure of Defendants.  For example, on September 15, 2004, the SEC issued an Order (the  "September 2004 Order") whereby the SEC settled an enforcement action against the investment adviser, sub-adviser, and principal underwriter and distributor for several of the Defendants' Funds. The suit charged the entities with *failing to disclose to  shareholders material facts and conflicts of interest that arose from their use of directed brokerage on the Funds' portfolio transactions to pay for "shelf space" arrangements with selected broker-dealers*.

5.      Similarly, on September 15, 2004, the California Attorney General's office settled a complaint against the distributor of the Funds, PA Distributors LLC, for violating securities laws by not disclosing "shelf-space" payments.  The complaint stated that PA Distributors LLC paid *at least 50 broker-dealers tens of millions of dollars as a quid pro quo to brokers who pushed the Funds on clients.*

6.      The practice of charging excessive fees and commissions created insurmountable conflicts of interest for the investment advisers to the Funds who had a duty to act in the best interests of fund investors, but were, in fact, only concerned with siphoning fees from the fund investors to induce brokers to artificially increase the amount of money invested Defendants' Funds.  Defendants were motivated to engage in this undisclosed plan of charging excessive fees to induce brokers to steer investors into Funds because the fees it collected for managing and advising the Funds were calculated as a percentage of average daily net assets under management, and, therefore, tended to increase as the number of Funds investors grew.

7.      The truth about Defendants began to emerge on November 17, 2003, when the SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned the brokerage house Morgan Stanley for, among other wrongdoing, accepting Defendants' impermissible payments in exchange for aggressively pushing the Defendants' Funds over other mutual funds through a program known as the "Partners Program."  Pursuant to the November 17, 2003 SEC Order Instituting Administrative and Cease-and Desist Proceedings, Making Findings, and Imposing Remedial Sanctions In the Matter of Morgan Stanley DW, Inc. (the "Morgan Stanley SEC Cease-and-Desist Order"),  Morgan Stanley was required to "place and maintain on its website within 15 days of the date of entry of the Order disclosures respecting the Partners Program to include…the fund complexes participating in the program."  *See*

http://www.sec.gov/litigation/admin/33-8339.htm at ¶ 43a.  As a result, on December 1, 2003,

the Morgan Stanley website acknowledged that Defendants' Funds was one of the fund families

that participated in the Partners Program.  *See* www.morganstanley.com/cgi-

bin/morganstanley.com/pressroom.cgi?action=load&uid=306.

      8.     In the action against Morgan Stanley, the SEC condemned the practices

complained about herein stating that:

> This matter arises from Morgan Stanley DW's failure to disclose
> adequately certain material facts to its customers…[namely that] it
> collected from a select group of mutual fund complexes amounts in
> excess of standard sales loads and Rule 12b-1 trail payments.
>
>     \*      \*      \*
>
> Although the Asset Retention Program and Partners funds'
> prospectuses and [Statements of Additional Information] contain
> various disclosures concerning payments to the broker-dealers
> distributing their funds, none  adequately disclose the preferred
> programs as such, nor do most provide sufficient facts about the
> preferred programs for investors to appreciate the dimension of the
> conflicts of interest inherent in them. For example, none of the
> prospectuses specifically discloses that Morgan Stanley DW
> receives payments from the fund complexes, that the fund
> complexes send portfolio brokerage commissions to Morgan
> Stanley DW or Morgan Stanley & Co. in exchange for enhanced
> sales and marketing, nor do they describe for investors the various
> marketing advantages provided through the programs.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at*
http://www.sec.gov/litigation/admin/33-8339.htm.

      9.     The SEC concluded that such conduct violated Section 17(a)(2) of the Securities

Act of 1933 ("Securities Act"), among other statutes, that prohibits one from obtaining money or

property "by means of any untrue statement of a material fact or any omission to state a material

fact necessary in order to make the statement made, in light of the circumstances under which

they made, not misleading."  *Id*.

10.     In a similar enforcement action, the NASD also condemned the practices at issue here and concluded that such payments to brokerages violated NASD Rule 2830(k) which prohibits the type of directed brokerage paid by ADAM of America.

11.     The actions of Defendants created insurmountable, undisclosed conflicts of interest in violation of the securities laws.  Defendants purposefully omitted to disclose any of the improper excessive fees and commissions passed on to plaintiffs and other members of the Class.  Defendants concealed such fees used to induce brokers to push Defendants' Funds as they realized that the inducements created an insurmountable conflict of interest significant to any reasonable person deciding how to invest his or her money.

12.     On January 14, 2004, Defendants' revenue-sharing shelf space program was further exposed when *The Wall Street Journal* reported that "it has found widespread evidence that brokerage firms steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements."

13.     Then, on September 15, 2004, both the SEC and California Attorney General's Office further exposed Defendants' improper conduct in enforcement actions brought against Defendants for the improper conduct alleged in this Complaint.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-33(b), 80a-35(a) and (b) and 80a-47(a); §§ 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-15; Conn. Gen. Stat. § 42-110A et seq.; and the common law.

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 44 of the Investment Company Act, 15 U.S.C. § 80a-43, § 214 of the Investment Advisers Act, 15 U.S.C. § 80b-14;  28 U.S.C. § 1331; 28 U.S.C. § 1367(a); and 28 U.S.C. § 1391(b).

16.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.  Defendant Allianz of America, Inc. ("Allianz of America") was, at all relevant times, and still is, headquartered in this District.

17.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

18.     Plaintiff Stephen R. Alexander IRA held during the Class Period and continues to own shares or units of the PIMCO NFJ Small-Cap Value Fund  and PIMCO Total Return Fund and has been damaged by the conduct alleged herein.  A copy of his verification is attached hereto as Exhibit B.

19.     Plaintiff Michael Phenicie held during the Class Period and continues to own shares or units of the PIMCO PEA Renaissance Fund and PIMCO NFJ Small-Cap Fund and has been damaged by the conduct alleged herein.  A copy of his verification is attached hereto as Exhibit B.

20.	Plaintiff John Layton held during the Class Period shares or units of the PIMCO StockPlus Fund and PIMCO Total Return Fund and has been damaged by the conduct alleged herein.

21.	Plaintiff Janet Hall held during the Class Period shares or units of the PIMCO PEA Innovation Fund, PIMCO High Yield Fund, PIMCO Total Return Fund, PIMCO Real Return Fund and PIMCO Short-Term Fund and has been damaged by the conduct alleged herein.

**Parent Companies**

22.	Defendant ADAM of America is one of the largest investment management organizations in the United States with more than $493.58 billion in assets under management as of December 31, 2003. ADAM of America is the parent of PIMCO Advisors Fund Management LLC ("PIMCO Advisors"), and is a member of the Allianz Group of companies. ADAM of America is located at 800 Newport Center Drive, Suite 600, Newport Beach, California 92600.

23.	Defendant Allianz of America Inc., a Delaware corporation which owns a 99.9% non-managing interest in ADAM of America, is a wholly-owned subsidiary of Allianz Aktiengesellschaft ("Allianz AG"). Allianz of America is located at 55 Green Farms Road, Westport, Connecticut 06880.

24.	Defendant Allianz Dresdner Asset Management of America Holding Inc. ("ADAM of America Holding"), a Delaware corporation which owns a 0.01% managing interest in ADAM of America, is a wholly-owned subsidiary of Allianz Dresdner Asset Management Aktiengesellschaft ("ADAM AG"), which is a wholly-owned subsidiary of Allianz AG. ADAM of America Holding is located at 800 Newport Center Drive, Suite 600, Newport Beach, California 92600.

**The Investment Advisers**

25.     Defendant PIMCO Advisors Fund Management LLC ("PIMCO Advisors") serves as investment adviser to each of Defendants' Funds.  As of September 30, 2003, PIMCO Advisors and its investment management affiliates had approximately $445 billion of assets under management. PIMCO Advisors is located at 1345 Avenue of the Americas, 50th Floor, New York, New York 10105.

26.     Defendant PIMCO Equity Advisors LLC ("PEA"), an indirect wholly-owned subsidiary of ADAM of America, acts as the sub-adviser and provides investment advisory services to the PEA Value, PEA Growth, PEA Target, PE A Opportunity, PEA Innovation, PEA Renaissance and PEA Growth & Income Funds. For services provided to these Funds, PIMCO Advisors pays PEA monthly fees at annual rates ranging from 0.35% to 0.55%.  As of September 30, 2003, accounts managed by PEA had combined assets of approximately $9.1 billion. PEA is located at 1345 Avenue of the Americas, 50th Floor, New York, NY 10105.

27.     Defendant Cadence Capital Management LLC ("CCM"), a Delaware limited liability company and subsidiary of ADAM of America, acts as the sub-adviser and provides investment advisory services to the CCM Focused Growth, CCM Capital Appreciation, CCM Mid-Cap and CCM Emerging Companies Funds. For services provided to these Funds, PIMCO Advisors pays CCM monthly fees at annual rates ranging from 0.35% to 1.15%. Accounts managed by Cadence had combined assets, as of September 30, 2003, of approximately $5.0 billion. CCM is located at 265 Franklin Street, 11th Floor, Boston, Massachusetts 02110.

28.     Defendant NFJ Investment Group L.P. ("NFJ"), a Delaware limited partnership and subsidiary of ADAM of America, provides investment advisory services to the NFJ Small-Cap Value, NFJ Large-Cap Value and NFJ Dividend Value Funds along with the Small-Cap Value Equity Discipline of the Multi-Discipline Portfolio. For services provided to these Funds,

PIMCO Advisors pays NFJ monthly fees at annual rates ranging from 0.35% to 0.50%. Accounts managed by NFJ had combined assets, as of September 30, 2003, of approximately $3.8 billion. NFJ is located at 2121 San Jacinto, Suite 1840, Dallas, Texas 75201.

29.     Defendant Nicholas-Applegate Capital Management LLC ("NACM"), a Delaware limited partnership and subsidiary of ADAM of America, provides investment advisory services to the NACM Flex-Cap Value, NACM Global, NACM Growth, NACM International, NACM Pacific Rim and NACM Value Funds and the International Equity Discipline of the Multi-Discipline Portfolio. For services provided to these Funds, PIMCO Advisors pays NACM monthly fees at annual rates ranging from 0.40% to 0.80%. As of September 30, 2003, accounts managed by Nicholas-Applegate had combined assets, of approximately $18.3 billion. NACM is located at 600 West Broadway, San Diego, California 92101.

30.     Defendant Pacific Investment Management Company LLC ("PIMCO"), a majority-owned subsidiary of ADAM of America with a minority interest held by PIMCO Partners, LLC. PIMCO Partners, LLC ("PIMCO Partners"), is owned by the current managing directors and executive management of PIMCO. PIMCO provides investment services to the Core Fixed Income Discipline of the Multi-Discipline Portfolio, for which PIMCO Advisors pays PIMCO monthly fees at an annual rate of 0.25% of the Fund's average daily net assets. As of September 30, 2003, PIMCO had approximately $356.5 billion of assets under management. PIMCO is located at 840 Newport Center Drive, Newport Beach, California 92660.

31.     Defendant RCM Capital Management LLC ("RCM"), a subsidiary of Allianz AG and an affiliate of the Adviser, is the sub-adviser for the PIMCO RCM Funds. For services provided to these Funds, PIMCO Advisors pays RCM monthly fees at annual rates ranging from 0.35% to 0.90%. As of September 30, 2003, RCM had approximately $30.8 billion in assets

under management. RCM is located at Four Embarcadero Center, San Francisco, California 94111.

32.     PIMCO Advisors, PEA, CCM, NFJ, NCAM, PIMCO and RCM are referred to collectively herein as the "Investment Adviser Defendants."

33.     The Investment Adviser Defendants are registered as investment advisers under the Investment Advisers Act.  Fees payable to the Investment Adviser Defendants are calculated as a percentage of fund assets under management.  The Investment Adviser Defendants had ultimate responsibility for overseeing the day-to-day management of Defendants' Funds.

**The Trustee Defendants**

34.     Defendant E. Philip Cannon ("Cannon") was a Trustee of at least 112 of the Defendants' Funds or the portfolios in which they invested during the Class Period.  During the Class Period, he was also a director for three Defendants' Funds, the Pacific Investment Management Company Series, PIMCO Commercial Mortgage Securities Trust, Inc., and PIMCO Variable Insurance Trust.  For his service as a Trustee overseeing the Defendants' Funds, Cannon received compensation of $186,471 for the calendar year ended June 30, 2002. Cannon's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

35.     Defendant Donald P. Carter  ("Carter") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period.  For his service as a Trustee overseeing the Defendants' Funds, Carter received compensation of $90,791 for the calendar year ended June 30, 2002.  Carter's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

36. Defendant Gary A. Childress ("Childress") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Childress received compensation of $80,353 for the calendar year ended June 30, 2002. Childress's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

37. Defendant Theodore J. Coburn ("Coburn") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period. During the Class Period, Coburn was also Chairman and Director of two registered investment companies in the PIMCO Advisors Fund Complex and Director of two registered investment companies in the Defendants' Advisors Fund Complex. For his service as a Trustee overseeing the PIMCO Funds, Coburn received compensation of $18,750 for the calendar year ended June 30, 2002. Coburn's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

38. Defendant W. Bryant Stooks ("Stooks") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Stooks received compensation of $80,921 for the calendar year ended June 30, 2002. Stooks's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

39. Defendant Gerald M. Thorne ("Thorne") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Thorne received compensation of $79,525 for the calendar year ended June 30, 2002. Thorne's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

40.     Defendant Stephen J. Treadway ("Treadway") was a Trustee of at least 44 of the Defendants' Funds or the portfolios in which they invested during the Class Period. During the Class Period, Treadway was also Chairman and Trustee of 12 registered investment companies in the ADAM of America Fund Complex. Treadway was the Managing Director of ADAM of America; Managing Director and Chief Executive Officer of PIMCO Distributors and PIMCO Advisors. Treadway's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

41.     Defendant Richard L. Nelson ("Nelson") was a Trustee of several of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Nelson received compensation of $147,744 for the calendar year ended June 30, 2002. Nelson's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

42.     Defendant Lyman W. Porter ("Porter") was a Trustee of several of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Porter received compensation of $146,587 for the calendar year ended June 30, 2002. Porter's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

43.     Defendant Alan Richards ("Richards") was a Trustee of several of the Defendants' Funds or the portfolios in which they invested during the Class Period. For his service as a Trustee overseeing the Defendants' Funds, Richards received compensation of $159,060 for the calendar year ended June 30, 2002. Richards's business address is 840 Newport Center Drive, Suite 300, Newport Beach, California 92660.

44. Defendants Cannon, Carter, Childress, Coburn, Stooks, Thorne, Treadway, Nelson, Porter, and Richards are collectively referred to herein as the "Trustee Defendants."

**The Distributor**

45. Defendant PA Distributors LLC (the "Distributor Defendant"), an indirect subsidiary of PIMCO Advisors and a broker-dealer registered with the Securities and Exchange Commission, serves as the principal underwriter of each class of the Defendants' Funds. PA Distributors is located at 2187 Atlantic Street, Stamford, Connecticut 06902.

**Nominal Defendants - The Funds**

46. Nominal defendants the Funds, as identified on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of trustees charged with representing the interests of the shareholders in one or a series of the funds. The Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

47. All the Funds are essentially alter egos of one another. The Funds are mainly pools of investor assets that are managed and administered by officers and employees of Defendants, not by Fund employees who are independent of Defendants. Individual Funds have no independent will and are totally dominated by Defendants and the common body of trustees established by Defendants. In substance, the Funds function as components of one unitary organization.

48. All Funds share the same investment advisers and/or principal underwriter and distributor. Additionally, as explained above, Defendants pool together fees and expenses

collected from the Funds investors, resulting in the Funds sharing expenses with one another.

The Statement of Additional Information, dated April 1, 2003 and made available to Funds

investors upon request (the "Statement of Additional Information"), which relates to the PIMCO

Funds: Multi-Manager Series, and is identical in substance to the Statements of Additional

Information filed by other Funds during the Class Period, describes how costs for research

services are commingled and shared by the various Funds:

> Some of these **[research] services are of value to the Adviser
> and Sub-Advisers in advising various of their clients** (including
> the Trust), although not all of these services are necessarily useful
> and of value in managing the Trust.

[Emphasis added.]

The SEC recognized unitary nature of the funds in the September 2004 Order where it stated:

"…the brokerage commissions paid by some MMS Funds were improperly used to subsidize the

distribution of the shares of other Funds in the fund complex."

### The John Doe Defendants

49.     Defendants John Does 1-100 were trustees of the Funds during the Class Period,

and any other wrongdoers later discovered, whose identities have yet to be ascertained and which

will be determined during the course of Plaintiffs' counsel's ongoing investigation.

### SUBSTANTIVE ALLEGATIONS

### DEFENDANTS IMPROPERLY USED INVESTORS' ASSETS TO UNDULY INFLUENCE BROKERS TO PUSH DEFENDANTS' FUNDS ON UNWITTING INVESTORS

50.     Unbeknownst to Plaintiffs and other members of the Class, ADAM of America

used the assets of its mutual fund investors to improperly pay brokerages to aggressively push it

Funds on unwitting investors through "shelf-space programs."  Ultimately, ADAM of America's

practices have led to enforcement actions by the SEC and the Attorney General's Office of California.

### Defendants Used Improper Means to Acquire "Shelf-Space" at Brokerages

51.    Unbeknownst to Plaintiffs and other members of the Class, ADAM of America used the assets of its mutual fund investors to participate in "shelf-space" programs at various brokerages, including, but not limited to, Morgan Stanley, Merrill Lynch, Smith Barney, A.G. Edwards, Paine Webber, and Wachovia Securities.  These improper *quid pro quo* arrangements were known as buying "shelf-space" at the brokerages.  These payments in exchange for "shelf-space" were nothing more than a series of veiled payments by ADAM of America to have brokers steer unknowing investors into its Funds.

52.    According to a former broker who was employed by Smith Barney during the Class Period and a former PIMCO wholesaler employed by Defendants during the Class Period, Defendants had "shelf space" arrangements at a number of large brokerages whereby Defendants made payments  to the brokerages to have the brokers aggressively push Defendants' Funds.   Moreover, according to the former PIMCO wholesaler, Defendants set aside substantial budgets which were used by Defendants to award top brokers who sold Defendants' Funds.

53.    These *quid pro quo* "shelf-space" agreements between Defendants and the brokerage firms called for millions of dollars in additional compensation to be paid from Defendants to the brokerages as incentive to steer unwitting investors into the Defendants' Funds, resulting in inflated fees being paid by investors. As stated in the April 1, 2003, PIMCO Large-Cap Value Fund prospectus, which is identical in substance to all prospectuses issued during the Class Period, these fees, which include management and 12b-1 fees, are "paid directly

from your [the shareholders'] investment".  These fees were assessed directly against shareholders and immediately affected the current redemption value of their shares.

54.      As explained below, the payments for these *quid pro quo* arrangements with brokerage houses came in the form of "directed brokerage", "revenue-sharing payment", and improper "soft dollars."

**Directed Brokerage**

55.      Defendants used directed brokerage as one method of kickback payment, whereby Defendants promised and sent brokerage business on the trades of securities in the Funds investment portfolios to satisfy their *quid pro quo* "shelf-space" arrangements with brokerages. This practice by Defendants has been condemned in the SEC's and California Attorney General's Office's September 15, 2004 actions against Defendants as well as actions against other mutual fund companies, because they violate the federal securities laws as well as state anti-fraud laws.

56.      Defendants improperly directed brokerage commissions to no less that nine brokerage houses during the Class Period as a part of *quid pro quo* arrangements to have the brokerages aggressive push Defendants' Funds on unwitting investors in exchange for the lucrative directed brokerage payments.

57.      In order to keep track of directed brokerage payments made by Defendants during the Class Period, Defendants used an internal code on these directed brokerages trades, labeling them on internal records as "Mutual Fund Sales."  Likewise, in addition to coding these directed brokerage trades on internal records, traders employed by Defendants also communicated the directed brokerage purpose of the trades to the traders at the broker-dealers who executed the trades.

58.     During the Class Period, Defendants used two methods of directed brokerage to satisfy their quid pro quo "shelf-space" arrangements. The first method involved sending the portfolio directed brokerage transaction directly to the distributing broker-dealer for execution. The second method involved using "introducing broker" arrangements, whereby Defendants executed the Fund portfolio directed brokerage transaction with one broker-dealer, but instructed that broker-dealer to credit the commission to another broker-dealer with whom Defendants had a shelf-space arrangement. The introducing broker paid the executing broker for its execution and clearing services and kept the rest of the commissions as profit.

**Revenue Sharing**

59.     In addition to the improper directed brokerage payments, Defendants also made revenue sharing payments to brokerage houses as part of the *quid pro quo* "shelf-space" arrangements. In other words, Defendants paid the brokerage houses **cash** to push their clients into the Defendants Funds. In fact, during the Class Period, some of the brokerage houses with whom Defendants had struck the "shelf-space" arrangements would send invoices to Defendants stating the amount still due under the shelf space arrangements which Defendants would then pay off in cash.

60.     To the extent revenue sharing payments were made in the form of commissions or otherwise, the Investment Advisers recouped these payments through their management fees.

**Soft Dollars**

61.     In addition to improper directed brokerage and revenue sharing payments, Defendants also used soft dollars to pay brokerages to push their clients into Defendants' Funds. Soft dollars reflect the amount of a commission above the actual execution cost. As stated above, one improper use of soft dollars by Defendants was through its "introducing broker"

arrangement, whereby Defendants executed the Fund portfolio transaction with one broker-dealer, but instructed that the broker-dealer credit the commission to another broker-dealer with whom Defendants had a shelf-space arrangement. The introducing broker paid the executing broker for its execution and clearing services and kept the rest of the commissions – *i.e.* the soft dollars - as profit.

### Defendants Concealed Their Practices From Investors

62. Defendants hid their "shelf-space" practices and program agreements from the Funds investors. Defendants concealed these practices because they knew any recommendations to own Defendants' Funds would be undermined if investors knew about the "shelf- space" arrangements.

### Defendants' "Shelf-Space" Program Created Undisclosed Conflicts of Interest

63. Defendants' participation in "shelf-space" programs through the means described above created undisclosed, insurmountable conflicts of interest. For example, Defendants' participation in "shelf-space" programs at Morgan Stanley, Merrill Lynch, and Smith Barney, among others, created an atmosphere where brokers did everything they could to steer investors into the Defendants' Funds in order to line their own pockets with money with absolutely no concern for the well-being of the investors. In addition, Defendants' directed brokerage as a means of paying shelf-space created additional conflicts of interest as creating incentives for brokers to push the Defendants' Funds took precedence over getting the bet execution price for the Defendants' Funds transactions.

### DEFENDANTS' PRACTICES RESULTED IN IMPROPER CONDUCT AT BROKERAGES

### Defendants' Improper "Shelf-Space" Arrangement With Morgan Stanley

64.     According to internal Morgan Stanley documents as well as former Morgan Stanley brokers who worked for Morgan Stanley during the Class Period, the "shelf-space" program in which Defendants participated at Morgan Stanley was called the "Partners Program." The Partners Program was nothing more than a series of veiled payments by Defendants to Morgan Stanley to steer investors into the Defendants' Funds. ***Under the Partners Program, Morgan Stanley brokers improperly pushed Defendants' Funds on unwitting clients because they received more money to do so.***

65.     Through the Partners Program, Defendants paid excessive commissions to Morgan Stanley brokers to induce them to sell the Defendants' Funds. According to former Morgan Stanley brokers and internal Morgan Stanley documents, pursuant to the Partners Program, Morgan Stanley adopted a broker "Incentive Compensation" payout grid that provided up to 3% greater compensation for "asset-based products" versus "transaction-based products." Defendants' Funds were classified as "asset-based products," while non-Partner Program funds were classified as "transaction-based products" and resulted in a smaller payout to the brokers.

66.     Due to the improper inducements paid by Defendants, Morgan Stanley's management made it clear through firm-wide memos that it wanted its brokers to take advantage of the payout grid by directing investors into Defendants' Funds. As stated by Bruce Alonso, the managing director of Morgan Stanley's Investor Advisory Services Division, in a firm-wide message entitled "An Important Message From Bruce Alonso Regarding the 2003 Compensation Plan" circulated throughout Morgan Stanley in December 2002: "the recently announced 2003 Compensation Plan provides you with the opportunity to increase your overall compensation by focusing on asset-based products," *i.e.,* Defendants' Funds.

67. Under the compensation grid discussed above, for instance, a broker whose annual production was over $1 million received 42% of the commissions on "asset-based products" and 40% of the commissions on "transaction-based products." Accordingly, brokers generally received a higher payout from the sale of the Defendants' Funds than non-Partner Program mutual funds.

68. Additionally, in order to further push Defendants' Funds and reap the benefits of the extra inducements from Defendants, Morgan Stanley management gave Defendants' Funds priority placement in the review of fund materials to be distributed to Morgan Stanley brokers; gave Defendants access to Morgan Stanley's branch system at the branch managers' discretion; gave Defendants direct access to Morgan Stanley brokers; included Defendants in Morgan Stanley broker events; and invited Defendants to participate in programs broadcasted to brokers over Morgan Stanley's internal systems.

**The Fine and Censure of Morgan Stanley for its Involvement with Defendants**

69. Morgan Stanley is just one of the brokerage houses to which Defendants made improper inducement payments in order to have Defendants' Funds pushed on investors. For its role in accepting these payments from Defendants, among other wrongdoing, Morgan Stanley has been fined and censured by the SEC and NASD and has agreed to pay fines totaling $50 million. On November 17, 2003, the SEC issued a press release (the "November 17 SEC Release") that announced:

> the institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) for failing to provide customers important information relating to their purchases of mutual fund shares. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.

> *Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds.* To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.

*Id.* (emphasis added).

70. The November 17 SEC Release further stated:

> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

> \*       \*       \*

> In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes.

> \*       \*       \*

> Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

> \*       \*       \*

> The NASD also announced today a settled action against Morgan
> Stanley for violations of NASD Rule 2830(k) arising from the
> Partners Program and its predecessor.

*Id.*

71.     With respect to the "shelf-space" program involving Defendants discussed above,

Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated that unbeknownst to

investors in the Defendants' Funds, "Morgan Stanley received monetary incentives [from

Defendants] -- in the form of "shelf space" payments -- to sell particular mutual funds [*i.e.,*

Defendants' Funds] to its customers. When customers purchase mutual funds, they should

understand the nature and extent of any conflicts of interest that may affect the transaction."

72.     In fining and censuring Morgan Stanley, the SEC stated that the shelf-space

program of which Defendants were a participant violated Section 17(a)(2) of the Securities Act.

Section 17(a)(2) expressly prohibits:

> [T]he use of any means or instruments of transportation or communication in
> interstate commerce or by the use of the mails, directly or indirectly…to obtain
> money or property by means of any untrue statement of a material fact or any
> omission to state a material fact necessary in order to make the statements made,
> in light of the circumstances under which they were made, not misleading.

73.     The investigation by the SEC and NASD and the resulting settlement with the

first target, Morgan Stanley, has received wide praise, including from members of Congress. As

stated by Sen. Peter Fitzgerald (R-Ill.) who is leading a Congressional inquiry of the mutual

funds industry:

> [The settlement] goes to show that the mutual fund managers as
> well as broker dealers have too often viewed mutual fund
> shareholders as sheep to be sheared. Congress has to figure out the
> variety of ways people are being sheared so that we can stop it.

Brook A. Masters and Kathleen Day, *Morgan Stanley Settles with SEC, NASD; Firm Accused of*

*Failing to Disclose Funds' Payments*, The Washington Post, Nov. 18, 2003, at E1.

## THE FINE AND CENSURE OF DEFENDANTS

74.     On January 14, 2004, *The Wall Street Journal* published an article under the headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers," citing "a person familiar with the investigation," which stated that the SEC is "close to filing its first charges against mutual-fund companies related to arrangements that direct trading commissions to brokerage houses that favor those fund companies' products . . . ." The article stated in pertinent part as follows:

> ***The SEC has been investigating the business arrangements between fund companies and brokerage houses since last spring.*** It held a news conference yesterday to announce ***it has found that widespread evidence that brokerage houses steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements***.
>
> Officials said the agency has opened investigations into eight brokerage houses and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing." Agency officials said they expect that number to increase as its probe expands. They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and as much as 0.25% of assets that remained invested in the fund.
>
>         *        *        *
>
> ***People familiar with the investigations say regulators are looking into examples of conflicts of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs out of the firms' own pockets. The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements. In other cases, the SEC is investigating whether funds violated policies that require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.***

*Id.* (emphasis added).

75.     Then on September 14, 2004, the SEC brought proceedings against Defendants for the conduct alleged herein, simultaneously announcing a settlement with Defendants that imposed remedial sanctions and imposed fines.  In its Order imposing the fines and sanctions, the SEC stated that brought its action against Defendants due to the "conflict of interest" that arose from the "shelf space" arrangements with brokerages.  Moreover, the SEC stated in its findings against Defendants that Defendants' Prospectuses and Statements of Information failed to properly disclose  to "shareholders that it directed Fund brokerage commissions to satisfy shelf space arrangements."  As a result, the SEC found that Defendants violated, among other statutes, section 34(b) of the Investment Company Act which makes it "unlawful for any person to make any untrue statement of a material fact in any registration statement."

76.     Also on September 14, 2004, the California Attorney General's Office brought proceedings against Defendants for violation of California's anti-fraud statute for the conduct alleged herein.  In announcing the proceedings and resulting settlement with Defendants, the California Attorney General's Office states that investors "deserve complete honesty and full disclosure when they make decisions to invest their hard-earned money…our securities laws rests on that foundation.  To protect investors, strong enforcement of these laws is crucial. That's why we brought this case."

77.     Moreover, the California Attorney General's Office stated in its September 14, 2004 press release that the "shelf space" arrangements at issue in this Complaint were material to investors because "they create an incentive for a broker-dealer to highlight, feature or recommend funds that best compensate the broker dealer or to meet other promises rather than to recommend investments that the meet the customer's personal investment needs."  Furthermore,

Defendants "failed to adequately disclose these agreements" thereby preventing "the prospective mutual fund investor from recognizing this potential and/or actual conflict of interest."

<u>**DEFENDANTS ENGAGED IN IMPROPER CONDUCT**</u>

**The Trustee Defendants Breached Their**
<u>**Fiduciary Duties To Fund Investors**</u>

78.     Mutual fund Boards of Trustees have a duty to protect investors and closely guard the fees paid to an Investment Adviser and guarantee that they are not excessive and that the Investment Adviser is acting in the best interest of the mutual fund investors.  As explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds Directors Forum:

> The board of directors of a mutual fund has significant responsibility to protect investors. By law, directors generally are responsible for the oversight of all of the operations of a mutual fund. In addition, under the Investment Company Act, directors are assigned key responsibilities, such as negotiating and evaluating the reasonableness of advisory and other fees, selecting the fund's independent accountants, valuing certain securities held by the fund, and managing certain operational conflicts.

> The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse.  Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.

> Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

http://www.sec.gov/news/speech/spch010704whd.htm.

79.     Likewise, the Investment Company Institute ("ICI"), of which Defendants are a member, recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure.  In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

**Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors.  The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.**

**In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.** [Emphasis added.][1]

http://www.ici.org/issues/dir/bro_mf_directors.pdf.

80.     The Defendants' Funds public filings state that the board of trustees for each trust is responsible for the management and supervision of each portfolio, or fund, comprising the Trust.  In this regard, the most recent Statement of Additional Information for funds offered by the Defendants' Funds: Multi-Manager Series (the "Statement of Additional Information"), which includes the PIMCO NFJ Small-Cap Value Fund and PIMCO Total Return Fund and which is available to the investor upon request, is typical of the Statements of Additional Information available for the other Defendants' Funds.  It states that "[t]he business of the Trust is managed under the direction of the Trust's Board of Trustees."

---

[1]     The ICI describes itself as the national association of the U.S. investment company industry.  Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts.  Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets.

81.     Moreover, the most recent Statement of Additional Information stated, with

respect to the duties of the trustees, as follows:

> The Trust has adopted an Administrative Services Plan with respect to the Administrative Class shares of each Fund. The Trust also has adopted an Administrative Distribution Plan (together with the Administrative Services Plan, the "Administrative Plans") with respect to the Administrative Class shares of each Fund.
>
> Under the terms of the Administrative Distribution Plan, the Trust is permitted to reimburse, out of the assets attributable to the Administrative Class shares of each applicable Fund, in an amount up to 0.25% on an annual basis of the average daily net assets of that class, financial intermediaries for costs and expenses incurred in connection with the distribution and marketing of Administrative Class shares and/or the provision of certain shareholder services to its customers that invest in Administrative Class shares of the Funds. Such services also may include, but are not limited to, the following: providing facilities to answer questions from prospective investors about a Fund; receiving and answering correspondence, including requests for prospectuses and statements of additional information; preparing, printing and delivering prospectuses and shareholder reports to prospective shareholders; complying with federal and state securities laws pertaining to the sale of Administrative Class shares; and assisting investors in completing application forms and selecting dividend and other account options.
>
> *       *       *
>
> Each Administrative Plan provides that it may not be amended to increase materially the costs which Administrative Class shareholders may bear under the Plan without the approval of a majority of the outstanding voting securities of the Administrative Class, and by vote of a majority of both (i) the Trustees of the Trust and (ii) those Trustees ("disinterested Administrative Plan Trustees") who are not "interested persons" of the Trust (as defined in the 1940 Act) and who have no direct or indirect financial interest in the operation of the Plan or any agreements related to it, cast in person at a meeting called for the purpose of voting on the Plan and any related amendments.
>
> Each Administrative Plan provides that it may not take effect until approved by vote of a majority of both (i) the Trustees of the Trust and (ii) the disinterested Administrative Plan Trustees. The Administrative Distribution Plan further provides that it may not take effect unless approved by the vote of a majority of the outstanding voting securities of the Administrative Class.

Each Administrative Plan provides that it shall continue in effect so long as such continuance is specifically approved at least annually by the Trustees and the disinterested Administrative Plan Trustees. Each Administrative Plan provides that any person authorized to direct the disposition of monies paid or payable by a class pursuant to the Plan or any related agreement shall provide to the Trustees, and the Board shall review at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were made.

\*       \*       \*

Rules of the NASD limit the amount of distribution fees that may be paid by mutual funds**. *"Service fees," defined to mean fees paid for providing shareholder services or the maintenance of accounts (but not transfer agency services) are not subject to the limits.* The Trust believes that some, if not all, of the fees paid pursuant to both Administrative Plans will qualify as "service fees" and therefore will not be limited by NASD rules.

\*       \*       \*

It has for many years been a common practice in the investment advisory business for advisers of investment companies and other institutional investors to receive research services from broker-dealers which execute portfolio transactions for the clients of such advisers. Consistent with this practice, the Adviser and Sub-Advisers receive research services from many broker-dealers with which the Adviser and Sub-Advisers place the Trust's portfolio transactions. These services, which in some cases may also be purchased for cash, include such matters as general economic and security market reviews, industry and company reviews, evaluations of securities and recommendations as to the purchase and sale of securities. ***Some of these services are of value to the Adviser and Sub-Advisers in advising various of their clients (including the Trust), although not all of these services are necessarily useful and of value in managing the Trust. The advisory fees paid by the Trust are not reduced because the Adviser and Sub-Advisers receive such services.***

In reliance on the "safe harbor" provided by Section 28(e) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), the Adviser and Sub-Advisers may cause the Trust to pay broker-dealers which provide them with "brokerage and research services" (as defined in the 1934 Act) an amount of commission for effecting a securities transaction for the Trust in excess of the commission which another broker-dealer would have charged for effecting that transaction.

***Consistent with the rules of the NASD and subject to seeking the most favorable price and execution available and such other policies as the***

> *Trustees may determine, the Adviser or Sub-Advisers may also consider sales of shares of the Trust and of other PIMCO Funds as a factor in the selection of broker-dealers to execute portfolio transactions for the Trust.*
>
> *\*      \*      \**
>
> *As required by applicable SEC rules, the Board of Trustees has adopted procedures which are reasonably designed to provide that any commissions, fees or other remuneration paid to an affiliated broker are consistent with the foregoing standards.*

[Emphasis added.]

82.     Another section of the Statement of Additional Information sets forth in greater detail the purported process by which the Defendants' Funds investment managers are selected:

> Under the terms of the Advisory Agreement, the Adviser is obligated to manage the Funds in accordance with applicable laws and regulations. The investment advisory services of the Adviser to the Trust are not exclusive under the terms of the Advisory Agreement. The Adviser is free to, and does, render investment advisory services to others.
>
> The Advisory Agreement will continue in effect with respect to a Fund for two years from its effective date, and thereafter on a yearly basis, provided such continuance is approved annually (i) by the holders of a majority of the outstanding voting securities of the Fund, or by the Board of Trustees, and (ii) by a majority of the Trustees who are not "interested persons" of the Trust (as defined in the 1940 Act) and who have no direct or indirect financial interest in the Advisory Agreement. The Advisory Agreement may be terminated without penalty by vote of the Trustees or the vote of a majority of the outstanding voting shares of the Trust (or with respect to a particular Fund, by the vote of a majority of the outstanding voting shares of such Fund), or by the Adviser, on 60 days' written notice to the other party and will terminate automatically in the event of its assignment. In addition, the Advisory Agreement may be terminated with regard to the PEA Renaissance, PEA Growth, PEA Target, PEA Opportunity and PEA Innovation Funds by vote of a majority of the Trustees who are not interested persons of the Trust, on 60 days' written notice to the Adviser.

83.     In truth and in fact, however, the Defendants' Funds boards of directors, *i.e.* the Trustee Defendants, were captive to and controlled by the Investment Adviser Defendants, who induced the Trustee Defendants to breach their statutory and fiduciary duties to manage and

supervise the Defendants' Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming Defendants' Funds assets. The Defendants' Funds board members were beholden for their positions, not to Defendants' Fund investors, but rather to the Investment Adviser Defendants they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed supposedly independent committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings), that went up to a year without convening. In this regard, the SAI dated April 1, 2003 for the PIMCO Funds: Multi-Manager Series is identical in substance to all SAI for the Funds in that it stated as follows:

> ***Under the Declaration of Trust, the Trust is not required to hold annual meetings of Trust shareholders to elect Trustees or for other purposes.*** It is not anticipated that the Trust will hold shareholders' meetings unless required by law or the Declaration of Trust. In this regard, the Trust will be required to hold a meeting to elect Trustees to fill any existing vacancies on the Board if, at any time, fewer than a majority of the Trustees have been elected by the shareholders of the Trust.

[Emphasis added.]

84. To ensure that the trustees toed the line, the Investment Adviser Defendants often recruited key fund trustees from the ranks of investment adviser companies and paid them excessive salaries for their service as trustees. For example, Stephen J. Treadway, the former Chairman, Managing Director of Adam of America, PIMCO Advisors Distributors, LLC and PIMCO Advisors Fund Management, LLC, was also the trustee and/or chairman of 13 registered investment companies in the Fund complex. All other trustees responsible for management of the Funds oversaw between 42 and 112 portfolios in the Fund complex. It is highly unlikely that Treadway properly performed his monitoring and supervisory functions with respect to each of

these portfolios as required by the Investment Company Act or even could have done so. It is common for other individuals to serve on the boards of dozens of Funds such that it is likewise impracticable for them to properly perform their supervisory and monitoring functions. Rather, the Funds directors functioned to falsely legitimize and validate the Investment Adviser Defendants' improper conduct.

85. In exchange for creating and managing the Funds, the Investment Adviser Defendants charged the Funds investors a variety of fees, each of which was calculated as a percentage of assets under management. Hence, the more money invested in the funds, the greater the fees paid to ADAM of America. In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Trustee Defendants' dependence on the investment management company, and its failure to properly manage the investment advisers, millions of dollars in the Funds assets were transferred through fees payable from the assets of the Funds investors to the Investment Adviser Defendants that were of no benefit to fund investors.

86. As a result of these practices, the mutual fund industry was enormously profitable *for ADAM of America* at the expense of Plaintiffs and other members of the Class who had invested in Funds. In this regard, another *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. ***Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund***

***becomes too large it loses the ability to trade in and out of positions
without hurting its investors.*** [. . .]

***The [mutual fund] business grew 71-fold (20 fold in real terms) in the
two decades through 1999, yet costs as a percentage of assets somehow
managed to go up 29%. . . .*** Fund vendors have a way of stacking their
boards with rubber stamps. As famed investor Warren Buffett opines in
Berkshire Hathaway's 2002 annual report: 'Tens of thousands of
"independent" directors, over more than six decades, have failed
miserably.' A genuinely independent board would occasionally fire an
incompetent or overcharging fund advisor. That happens just about
never."

[Emphasis added.]

87.     Plaintiffs and other members of the Class never knew, nor could they have

known, from reading the fund prospectuses or otherwise, of the extent to which the Investment

Adviser Defendants were using directed brokerage, commissions, and so-called 12b-1 fees to

improperly siphon investor assets that were directed to brokers pursuant to the "shelf-space"

agreements discussed above.

**The Improper Use of Excessive Commissions and Directed Brokerage Business**

88.     The Investment Adviser Defendants paid excessive commissions and directed

brokerage business to broker-dealers who steered their clients into the Funds as part of a *quid pro*

*quo* "shelf-space program" arrangement between ADAM of America and brokerages. Such

payments were used to fund sales contests and other undisclosed financial incentives to further

push the Funds. These incentives created an undisclosed conflict of interest and caused brokers

to steer clients to the Funds regardless of the funds' investment quality relative to other

investment alternatives and to thereby breach their duties of loyalty. As described by the

National Association of Insurance and Financial Advisors:

> Directed brokerage results when a mutual fund manager uses
> commissions payable for executing the fund's securities trades to
> obtain a preferred position for the fund in the broker-dealer's

distribution network.  This practice creates numerous potential conflicts of interest, including possible incentives for broker-dealers to base their fund recommendations to customers on brokerage commission considerations rather than on whether a particular fund is the best match for a client.

*See* http://www.naifa.org/frontline/20040428_SEC_aa.html.

89.     By paying the excessive commissions and directing brokerage business to participate in "shelf-space programs," the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.  Additionally, in several actions to date against brokerages and mutual funds, including Defendants, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf-space programs" - as Defendants have done here - are highly improper.

90.     Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated, "An investment adviser's undisclosed use of mutual fund assets to defray the adviser's, or an affiliated distributor's, own marketing expenses is a breach of the adviser's duty. Our action today — like the action brought by the Commission against Massachusetts Financial Services Company some six months ago — demonstrates the Commission's resolve to ensure that mutual fund shareholders know how their money is being spent." See Press Release at http://www.sec.gov/news/press/2004-130.htm

91.     Moreover, Ari Gabinet, head of the SEC's Philadelphia Office, added, "When mutual fund advisers pay for shelf space arrangements by using directed brokerage on fund portfolio transactions, they must disclose those arrangements. If they fail to do so, as the PIMCO entities failed to do in this case, we will bring charges for violations of the securities laws." Id.

92.     As they have against Defendants, the SEC has brought actions against other

mutual fund companies for the same type of behavior complained about here.  As stated in a

recent Administrative Proceeding against Massachusetts Financial Services, Inc. ("MFS"):

> **MFS did not adequately disclose to MFS shareholders that it
> allocated fund brokerage commissions to satisfy strategic
> alliances**.
>
> Specifically, Item 16(c) of the Form N-1A requires a description in
> the SAI of "how the Fund will select brokers to effect securities
> transactions for the Fund" and requires that "[i]f the Fund will
> consider the receipt of products or services other than brokerage or
> research services in selecting brokers, [the Fund should] specify
> those products or services."
>
> \*       \*       \*
>
> **The SAIs did not adequately disclose to shareholders that MFS
> had entered into bilateral arrangements in which it agreed to
> allocate specific negotiated amounts of fund brokerage
> commissions, subject to best execution, to broker-dealers for
> "shelf-space" or heightened visibility within their distribution
> systems**.

*See* The March 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist
Proceedings, Making Findings and Imposing Remedial Sanctions Against MFS, File No. 3-
22450, *at* http://www.sec.gov/litigation/admin/ia-2224.htm [Emphasis added.]

93.     Similarly, in the Administrative Proceeding against Morgan Stanley, the SEC

explained:

> At issue in this matter are two distinct disclosure failures. The first
> relates to Morgan Stanley DW's operation of mutual fund
> **marketing programs in which it collected from a select group
> of mutual fund complexes amounts in excess of standard sales
> loads and Rule 12b-1 trail payments. These programs were
> designed to specially promote the sale of those mutual funds
> with enhanced compensation to individual registered
> representatives, known as financial advisors ("FAs"), and
> branch managers as well as increased visibility in its extensive
> retail distribution network**.

*See* The Morgan Stanley SEC Cease-and-Desist Order, *at* http://www.sec.gov/litigation/admin/33-8339.htm [Emphasis added.]

94.     The excessive commissions and directed brokerage business used by Defendants, and considered improper by the SEC as noted above, did not fund any services that benefited the Funds' shareholders.  This practice materially harmed plaintiffs and other members of the Class from whom the illegitimate and improper fees were taken.

**The Investment Adviser Defendants Used
Rule 12b-1 Marketing Fees For Improper Purposes**

95.     Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan and any related agreements must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made."  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued."  The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15

U.S.C. 80a-35(a) and (b)] of the Act that ***there is a reasonable likelihood that the plan will benefit the company and its shareholders.***" [Emphasis added.]

96.     The exceptions to the Section 12b-1 prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and the Investment Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

97.     However, the purported Rule 12b-1 fees charged to the Funds' investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to the Funds' investors.  For example, ***despite the fact that the net assets for the CCM Capital Appreciation Fund Class A increased by from $91.296 million to $147.590 million during the Class Period, the net asset value per share of the fund decreased by more than 47%, falling from $26.65 per share at year end 1999 to $14.03 at year end 2003.  Yet during the same period, expenses charged by Defendants remained the same, with the ratio of expenses to net assets remaining 1.10%.***

98.     Moreover, Defendants failed to impose any 12b-1 breakpoints -- *i.e.* reductions in 12b-1 fees -- as the assets of the funds increased.  The concept of breakpoints is that as fund assets increase, certain fixed costs remain the same, thereby reducing the overall costs per

investor.  Despite this fact, Defendants failed to impose 12b-1 breakpoints for payments that should not have increased as the size of the Fund assets increased.

99.     This increase and/or constant in fees while the net asset value plummeted, and the failure to grant any 12b-1 breakpoints, were red flags that the Trustee Defendants knowingly or recklessly disregarded.  If anything, the Funds' marketing efforts were creating diminishing marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance.  The Trustee Defendants ignored or failed to review written reports of the amounts expended pursuant to the Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing Fund investors, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Fund investors.

100.    Moreover, at least six classes of Funds were closed to new investors ("the Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been used to market and distribute them.  Nevertheless, the Investment Adviser Defendants received Rule 12b-1 fees charged to the Closed Funds.  The Closed Funds that charged such Rule 12b-1 fees are PIMCO NFJ Small-Cap Value Class A, B, C, D, R and Admin Funds.

101.    As discussed throughout this Complaint, in violation of Rule 12b-1, Defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the Funds Rule 12b-1 plan.  Defendants wrongfully inflated advisory fees by shifting to the Funds or investors expenses which were the responsibility of the Investment Advisers without any corresponding reduction in the advisory fees.  This resulted in inflated advisory fees.

## The Improper Use of Excessive Commissions and Directed Brokerage Business

102.     The Investment Adviser Defendants paid excessive commissions and directed brokerage business to broker-dealers who steered their clients into the Funds as part of a *quid pro quo* "shelf-space program" arrangement between Defendants and brokerages.  Such payments and directed-brokerage payments were used to fund undisclosed financial incentives to further push the Funds.  These incentives created an undisclosed conflict of interest and caused brokers to steer clients to the Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty.

103.     By paying the excessive commissions and directing brokerage business to participate in "shelf-space programs," the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.  Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf-space programs" - as ADAM of America has done here - are highly improper.

104.     The excessive commissions and directed brokerage business used by Defendants did not fund any services that benefited the Fund shareholders.  This practice materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees under the guise of so-called excessive commissions and directed brokerage business were taken.

### Improper Use of Soft Dollars

105.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe

harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that a fund manager shall not be deemed to have breached his fiduciary duties "solely by reason of his having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined *in good faith* that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

106.    According to Nelson Information's Directory of Investment Mangers (14th Ed. 2000) (the "Nelson Directory"), PIMCO Equity Advisors is "an independent investment advisor providing equity portfolio management..." *Id.* at 3718. PIMCO Equity Advisors manages assets "[t]hrough [its] extensive in-depth proprietary research." *Id.*

107.    Consistent with this philosophy, the Nelson Directory, for the relevant years during the Class Period, states that PIMCO Equity Advisors' research sources are **80% in-house** research and only **10% street** research and **10% consultant/other** research. *Id.* Based on PIMCO Equity Advisors' own proprietary research apparatus, there is demonstrably little need for reliance on outside research. The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using Soft Dollars as excessive

commissions to pay brokers to push clients into the Funds. The Investment Adviser Defendants used Soft Dollars to pay for these excessive commissions that served as kickbacks to brokers, thus charging the Fund investors for costs not covered by the Section 28(e) safe harbor and that were in violation of the investment advisers' fiduciary duties.

108. The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into the Funds. The Investment Adviser Defendants used Soft Dollars to pay for these excessive commissions as well as overhead costs (for items such as overpriced computer hardware and software) thus charging the Funds' investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties.

109. As a result, the amounts paid for "research" were expenses that were unnecessary for management of the Funds investments because the real purpose of such payments was to push the Funds' shares. Alternatively, if such fees were necessary, the Investment Advisers were improperly inflating its management fees for "research" that had already been conducted and was not effective.

**Demand on the Boards to Take Corrective Action Would Be Futile**

110. Plaintiffs have not made any demand on the Boards of Directors (the "Boards") to institute their sole derivative claim, Count V of this Complaint. Such demand would be a futile and useless act because the Boards are incapable of making an independent and disinterested decision for the following reasons:

111. As alleged in detail herein, each of the Trustee Defendants was appointed by, and serves at the pleasure of, the Investment Adviser Defendants. Each of the Trustee Defendants is

controlled by and beholden to the Investment Adviser Defendants for his or her position and substantial compensation as a Director. Although as a technical matter, the shareholders have a right to vote out the Directors, the Directors know that this is extremely unlikely if the Investment Advisers support the Directors, which they have done throughout the Class Period. Accordingly, each of the Trustee Defendants is incapable of evaluating a demand independently and disinterestedly.

112. Because of their lack of independence from the Investment Adviser Defendants, the Trustee Defendants wrongfully approved advisor fees, 12b-1 fees, Soft Dollars, and the materially misleading disclosures in the Funds' Prospectuses in each of the years they served as Directors.

113. As alleged in detail herein, each of the Trustee Defendants knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of herein. The conduct of the Trustee Defendants was in breach of their fiduciary duties and could not have been an exercise of good faith business judgment.

114. The Trustee Defendants allowed a course of conduct that prejudiced the Funds and investors as the Trustee Defendants allowed the excessive fees to be charged and shareholder investments to be used for improper purposes such as kickbacks to brokers. The payment of kickbacks to brokers that injured shareholders was conduct that should have been prevented by the Trustee Defendants, but was not.

115. The Trustee Defendants also were self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the Funds in order to increase the asset in the Funds. Growth of a mutual fund is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with

another fund. If the mutual fund is disbanded or merged, the board members for that fund necessarily lose their positions on the fund's board as well as the compensation for sitting on the fund's board.

116. Additionally, each of the Trustee Defendants received substantial payments and benefits by virtue of his or her membership on one or more Boards and his or her control of hundreds of the Funds, as follows:

a) Defendant Cannon oversaw at least 112 Portfolios and received compensation of at least $186,471 for the calendar year ending June 30, 2002;

b) Defendant Carter oversaw at least 44 Portfolios and received compensation of at least $90,791 for the calendar year ending June 30, 2002;

c) Defendant Childress oversaw at least 44 Portfolios and received compensation of at least $80,353 for the calendar year ending June 30, 2002;

d) Defendant Coburn oversaw at least 44 Portfolios and received compensation of at least $18,750 for the calendar year ending June 30, 2002;

e) Defendant Stooks oversaw at least 44 Portfolios and received compensation of at least $80,921 for the calendar year ending June 30, 2002;

f) Defendant Thorne oversaw at least 44 Portfolios and received compensation of at least $79,525 for the calendar year ending June 30, 2002;

g) Defendant Nelson oversaw several Portfolios and received compensation of at least $147,744 for the calendar year ending June 30, 2002;

h) Defendant Porter oversaw several Portfolios and received compensation of at least $146,587 for the calendar year ending June 30, 2002; and

i) Defendant Richards oversaw several Portfolios and received compensation of at least $159,060 for the calendar year ending June 30, 2002.

117. Each of the Trustee Defendants has thus benefited from the wrongdoing herein alleged and has engaged in such conduct to preserve his or her positions of control and the benefits thereof.

118. Each of the Trustee Defendants continues to serve as a Director, and the Trustee Defendants comprise the Boards. Thus, in order to bring this action for breaching their fiduciary duties, the Trustee Defendants would be required to sue themselves and their fellow Directors with whom they have had close business and personal relationships throughout the Class Period. Accordingly, a majority of the Boards is incapable of evaluating a demand independently and disinterestedly.

**The Prospectuses and SAIs Were Materially False And Misleading**

119. Defendants use a series of combined prospectuses ("Prospectuses"), whereby several Funds were covered by one Prospectus during the Class Period. Plaintiffs and other members of the Class were entitled to, and did, receive one or more of these Prospectuses, pursuant to which the Funds shares were offered.

120. Prospectuses and SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

121. Each of the Prospectuses and SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them. As seen below, each of the Prospectuses and SAIs contained the same materially false and misleading statements and omissions regarding revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.

43

122.     Each of the Prospectuses and SAIs issued during the Class Period contained

substantially the same materially false and misleading omissions of key information regarding

the Funds' revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that were required to

be disclosed in "easy to understand language" such that a reasonable investor could make an

informed decision whether or not to invest in the Funds.

**Material Omissions Regarding Revenue Sharing**

123.     The April 1, 2003 SAI for the PIMCO Funds: Multi-Manager Series is identical in

substance to all Prospectuses issued during the Class Period in that under the heading

DISTRIBUTION OF TRUST SHARES it stated as follows with respect to its description of the

distribution plan and method by which it offered its shares to the public:

> The Distributor may from time to time pay additional cash bonuses
> or other incentives to selected participating brokers in connection
> with the sale or servicing of Class A, Class B, Class C and Class R
> shares of the Funds. On some occasions, such bonuses or
> incentives may be conditioned upon the sale of a specified
> minimum dollar amount of the shares of a Fund and/or all of the
> Funds together or a particular class of shares, during a specific
> period of time. The Distributor currently expects that such
> additional bonuses or incentives will not exceed .50% of the
> amount of any sale. In its capacity as administrator for the Funds,
> PIMCO Advisors Fund Management may pay participating
> brokers and other intermediaries for sub-transfer agency and other
> services.

124.     The Prospectuses and SAIs are materially false and misleading in that it failed to

disclose, *inter alia,* the following material and damaging adverse facts which damaged Plaintiffs

and other members of the Class:

(a)     that the Investment Adviser Defendants and/or Distributor Defendant used

investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as

"shelf-space" programs whereby the broker steered clients into Defendants' Funds;

(b)     that the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs;

(c)     that the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored the Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 Plan;

(d)     that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(e)     that such revenue sharing payment created undisclosed conflicts of interest;

(f)     that the Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(g)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to Funds investors; but rather, as the Funds grew, fees charged to Funds investors continued to increase; and

(h)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise

the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants

were able to systematically skim millions of dollars from the investors of Funds.

**Material Omissions Regarding Directed Brokerage Business**

125.     The April 1, 2003 SAI for the PIMCO Funds: Multi-Manager Series is identical in

substance to all Prospectuses issued during the Class Period in that under the heading

PORTFOLIO TRANSACTIONS AND BROKERAGE it states:

> The Adviser and/or each Sub-Adviser places orders for the purchase and sale of portfolio securities, options and futures contracts and buys and sells such securities, options and futures for the Trust through a substantial number of brokers and dealers. In so doing, **the Adviser or Sub-Adviser uses its best efforts to obtain for the Trust the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions as described below.** In seeking the most favorable price and execution, the Adviser or Sub-Adviser, having in mind the Trust's best interests, considers all factors it deems relevant, including, by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience and financial stability of the broker-dealer involved and the quality of service rendered by the broker-dealer in other transactions.

[Emphasis added.]

126.     The above statement is materially false and misleading in that it failed to disclose

that Defendants chose brokers and/or the Distributor Defendant to execute sales of the Funds'

portfolios - and thereby directed the commissions from the sales of the portfolios securities to

these brokers - to satisfy negotiated arrangements with brokerages to give ADAM of America

"shelf-space" visibility and to push their clients in the Funds in exchange for directed brokerage.

Additionally, the above statement is materially false and misleading for the following reasons:

(a)     that the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space programs" whereby the broker steered clients into the Funds;

(b)     that the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)     that the Investment Adviser Defendants and/or Distributor Defendants directed brokerage payments to firms that favored the Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space programs" and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 Plan;

(d)     that the Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e)     that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(f)     that such revenue sharing payment created undisclosed conflicts of interest;

(g)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to the Funds investors; but rather, as the Funds grew, fees charged to the Funds investors continued to increase; and

(h)     that the Trustee Defendants had abdicated their duties under the

Investment Company Act and their common law fiduciary duties, failed to monitor and supervise

the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants

were able to systematically skim millions of dollars from the PIMCO Fund investors.

**Material Omissions Regarding Soft Dollars**

127.     The April 1, 2003 SAI for the PIMCO Funds: Multi-Manager Series is identical in

substance to all Prospectuses issued during the Class Period in that under the heading SOFT

DOLLARS it states:

> The Adviser or, pursuant to the portfolio management agreements, a Sub-Adviser, places orders for the purchase and sale of portfolio investments for a Fund's accounts with brokers or dealers selected by it in its discretion. In effecting purchases and sales of portfolio securities for the accounts of the Funds, the Adviser and the Sub-Advisers will seek the best price and execution of the Funds' orders. In doing so, a Fund may pay higher commission rates than the lowest available when the Adviser or Sub-Adviser believes it is reasonable to do so in light of the value of the brokerage and research services provided by the broker effecting the transaction, as discussed below. The Adviser and Sub-Advisers also may consider sales of shares of the Trust as a factor in the selection of broker-dealers to execute portfolio transactions for the Trust.
>
> It has for many years been a common practice in the investment advisory business for advisers of investment companies and other institutional investors to receive research services from broker-dealers which execute portfolio transactions for the clients of such advisers. Consistent with this practice, the Adviser and Sub-Advisers receive research services from many broker-dealers with which the Adviser and Sub-Advisers place the Trust's portfolio transactions. These services, which in some cases may also be purchased for cash, include such matters as general economic and security market reviews, industry and company reviews, evaluations of securities and recommendations as to the purchase and sale of securities. **Some of these services are of value to the Adviser and Sub-Advisers in advising various of their clients (including the Trust), although not all of these services are necessarily useful and of value in managing the Trust. The advisory fees paid by the Trust are not reduced because the Adviser and Sub-Advisers receive such services.**

> In reliance on the "safe harbor" provided by Section 28(e) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), the Adviser and Sub-Advisers may cause the Trust to pay broker-dealers which provide them with "brokerage and research services" (as defined in the 1934 Act) an amount of commission for effecting a securities transaction for the Trust in excess of the commission which another broker-dealer would have charged for effecting that transaction.

(Emphasis added.)

128.     The Prospectuses and SAIs failed to disclose, *inter alia,* the following material and damaging adverse facts regarding Soft Dollars which damaged Plaintiffs and other members of the Class:

(a)      that the Investment Adviser Defendants and/or Distributor Defendant used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space programs" whereby the broker steered clients into the Funds;

(b)      that the Investment Advisor Defendants and/or Distributor Defendant used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)      that the use of brokerage commissions to satisfy bilateral arrangements with brokers known as "shelf-space" programs violated Section 28(e) of the Exchange Act;

(d)      that the Investment Adviser Defendants and/or Distributor Defendant directed brokerage payments to firms that favored the Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space programs" and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 Plan;

(e)      that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(f)     that such revenue sharing payment created undisclosed conflicts of interest;

(g)     that the Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(h)     that any economies of scale achieved by marketing of the Funds to investors were not passed on to the Funds investors; but rather, as the Funds grew, fees charged to the Funds investors continued to increase; and

(i)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendant and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the assets of the Funds' investors.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

129.    Plaintiffs bring these claims (except for Count V which is brought derivatively on behalf of the Funds) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units, or like interests in any of the Funds between February 4, 1999 to, November 17, 2003, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

130.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

133.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Investment Company Act was violated by Defendants' acts as alleged herein;

(b)     whether the Investment Advisers Act was violated by Defendants' acts as alleged herein;

(c)     whether the Connecticut Unfair Trade Practices Act was violated by Defendants' acts as alleged herein;

(d)     whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(e)     whether Defendants omitted to disclose to the investing public during the Class Period material facts about the business, operations, and financial statements of the Funds; and

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages.

134.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## INVESTMENT COMPANY ACT CLAIMS

## COUNT I

## AGAINST THE INVESTMENT ADVISER DEFENDANTS AND TRUSTEE DEFENDANTS FOR VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

135.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136.     This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Funds and against the Trustee Defendants for their role in the creation of the materially false and misleading Prospectuses.

137.     The Investment Adviser Defendants and Trustee Defendants omitted to state facts necessary to prevent statements in registration statements and reports filed and disseminated pursuant to the Investment Company Act, in light of the circumstances under which they were

made, from being materially false and misleading. The Investment Adviser Defendants and Trustee Defendants failed to disclose the following:

(a) that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services known as "shelf-space" and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b) that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(c) that the Investment Adviser Defendants and/or the Distributor Defendant directed brokerage payments to firms that favored the Funds, which constituted a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 Plan;

(d) that the Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12(b) of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Trustee Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e) that by paying brokers to aggressively steer their clients to the Funds, the Investment Adviser Defendants and/or the Distributor Defendant were knowingly and/or recklessly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(f)     that any economies of scale achieved by marketing of the Funds to new investors were not passed on to the Funds' investors; on the contrary, as the Funds grew, fees charged to the Funds' investors continued to increase;

(g)     that Defendants improperly used Soft Dollars and excessive commissions, paid from the Fund investors' assets, to pay for overhead expenses the cost of which should have been borne by ADAM of America and not the Funds investors; and

(h)     that the Trustee Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Trustee Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Fund investors.

138.    By reason of the conduct described above, the Investment Adviser Defendants and the Trustee Defendants violated Section 34(b) of the Investment Company Act.

139.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' and Trustee Defendants' violation of Section 34(b) of the Investment Company Act, the Funds investors have incurred damages.

140.    Plaintiffs and other members of the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by shareholders as a result of being induced to hold the Funds, rather than by the Funds themselves.

141.    The Investment Adviser Defendants and Trustee Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce

and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

**AGAINST THE DISTRIBUTOR DEFENDANT, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE DEFENDANTS PURSUANT TO SECTION 36(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS**

142.     Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

143.     This Count is brought against the Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants for breach of their fiduciary duties as defined by Section 36(a) of the Investment Company Act.

144.     The Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants had a fiduciary duty to the Class.

145.     The Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants violated Section 36(a) by improperly charging investors in the Funds purported Rule 12b-1 marketing fees, and by drawing on assets of the Funds investors to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

146.     By reason of the conduct described above, the Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants violated Section 36(a) of the Investment Company Act.

147.     As a direct, proximate and foreseeable result of the Distributor Defendant's, the Investment Adviser Defendants' and the Trustee Defendants' breaches of fiduciary duties in their

roles as principal underwriter, investment advisers, and directors and officers, respectively, to the Funds' investors, the Class has incurred millions of dollars in damages.

148.    Plaintiffs, in this count, seek to enjoin Defendants from engaging in such practices in the future as well as recover improper Rule 12b-1 fees, Soft Dollars, excessive commissions, directed brokerage, directors' compensation and the management fees charged the Funds by the Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants.

## COUNT III

### AGAINST THE DISTRIBUTOR DEFENDANT, THE INVESTMENT ADVISER DEFENDANTS AND THE TRUSTEE DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

149.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporates the allegations contained above.

150.    This Count is brought by the Class against the Distributor Defendant, the Investment Adviser Defendants and the Trustee Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

151.    The Distributor Defendant, the Investment Adviser Defendants, and the Trustee Defendants had a fiduciary duty to the Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Distributor Defendant, the Investment Adviser Defendants, and the Trustee Defendants.

152.    The Distributor Defendant, the Investment Adviser Defendants, and the Trustee Defendants violated Section 36(b) by improperly charging investors in the Funds purported Rule 12b-1 marketing fees.  They also charged excessive advisory fees under 36(b) because they improperly inflated management fees because they shifted expenses from the Investment

Advisers to the Funds investors without a corresponding reduction in their management fees to reflect that shift in expense.

153.     By reason of the conduct described above, the Distributor Defendant, the Investment Adviser Defendants, and the Trustee Defendants violated Section 36(b) of the Investment Company Act.

154.     The Trustee Defendants received improper payments, in that they received their compensation despite the fact they violated their fiduciary duties.

155.     As a direct, proximate and foreseeable result of the Distributor Defendant's, the Investment Adviser Defendants' and the Trustee Defendants' breach of their fiduciary duties in their roles as principal underwriter, investment advisers, and directors and officers, respectively, the Class has incurred millions of dollars in damages.

156.     Plaintiffs, in this count, seek to recover the Rule 12b-1 fees, Soft Dollars, excessive commissions advisor and management fees charged the Funds by the Distributor Defendant, the Investment Adviser Defendants, and the Trustee Defendants.

## COUNT IV

### AGAINST ADAM OF AMERICA (AS CONTROL PERSON OF THE DISTRIBUTOR DEFENDANT AND THE INVESTMENT ADVISER DEFENDANTS) FOR VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

157.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.     This Count is brought pursuant to Section 48(a) of the Investment Company Act against Adam of America as control person of the Distributor Defendant and the Investment

Adviser Defendants who caused the Investment Adviser Defendants to commit the violations of the Investment Company Act alleged herein.

159. The Distributor Defendant is liable under Sections 34(b), 36(a) and 36(b) of the Investment Company Act to the Funds as set forth herein.

160. The Investment Adviser Defendants are liable under Sections 34(b), 36(a) and 36(b) of the Investment Company Act as set forth herein.

161. ADAM of America was a "control person" of the Distributor Defendant and the Investment Adviser Defendants and caused the violations complained of herein. By virtue of its position of operational control and/or authority over the Investment Adviser Defendants and/or Distributor Defendant – ADAM of America, directly and indirectly, had the power and authority, and exercised the same, to cause the Distributor Defendant and/or the Investment Adviser Defendants to engage in the wrongful conduct complained of herein.

162. Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, ADAM of America is liable to Plaintiffs to the same extent as are the Distributor Defendant and the Investment Adviser Defendants for their primary violations of Sections 34(b), 36(a) and 36(b) of the Investment Company Act.

163. By virtue of the foregoing, the Funds, Plaintiffs and other Class members are entitled to damages against ADAM of America.

## INVESTMENT ADVISER ACT CLAIMS

## COUNT V

### AGAINST THE INVESTMENT ADVISER DEFENDANTS UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT FOR VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT DERIVATIVELY ON BEHALF OF THE FUNDS

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

166.    The Investment Adviser Defendants had advisory contracts with the Funds and served as "investment advisers" to the Funds and other members of the Class pursuant to the Investment Advisers Act.  The Funds, and their shareholders, were the intended beneficiaries of these advisory contracts and investment advisor services.

167.    As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

168.    During the Class Period, the Investment Adviser Defendants breached their fiduciary duties to the Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Funds.  The Investment Adviser Defendants breached their fiduciary duties owed to the Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon the Funds. The Investment Adviser Defendants are liable as

direct participants in the wrongs complained of herein.  The Investment Adviser Defendants, because of their position of authority and control over the Funds were able to and did control the fees charged and collected, and otherwise control the operations of the Funds.

169.    The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Funds.  The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Funds from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including:  (1) the charging of improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" in exchange for "shelf-space"; and (4) charging excessive and improper commission payments used to pay off brokers.

170.    As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Funds, the Funds were damaged.

171.     The Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## CONNECTICUT UNFAIR TRADE PRACTICES ACT CLAIM

## COUNT VI

## AGAINST ALL DEFENDANTS FOR VIOLATION OF THE  CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA) ON BEHALF OF THE CLASS

172.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

173. In violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a et seq., all defendants used and employed unconscionable commercial practices, deception, fraud, misrepresentations, and/or the knowing concealment, suppression and/or omission of material facts with the intent that others rely thereon, regarding the Funds. Specifically, defendants misrepresented, expressly and/or by implication, and/or intentionally omitted to state material facts regarding, and engaged in the unconscionable commercial practice, deception and fraud of, the excessive and improper fees charged in connection with the Funds and the "shelf-space programs" whereby Defendants paid kickbacks to brokers to push the Funds.

174. Plaintiffs and the other members of the Class suffered an ascertainable loss of money as a result of Defendants' use or employment of these unfair methods of competition and unfair or deceptive acts or practices.

175. By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to punitive damages against all Defendants.

## BREACH OF FIDUCIARY DUTY CLAIMS

### COUNT VII

**BREACH OF FIDUCIARY DUTY AGAINST
THE INVESTMENT ADVISER DEFENDANTS ON BEHALF OF THE CLASS**

176. Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

177. As advisers to the Funds that were made up of Plaintiffs' and other Class members' investments, the Investment Adviser Defendants were fiduciaries to the Plaintiffs and other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

178.    As set forth above, the Investment Adviser Defendants breached their fiduciary duties to Plaintiffs and the Class.

179.    Plaintiffs and the Class have been specifically injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

180.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

<u>**COUNT VIII**</u>

**BREACH OF FIDUCIARY DUTY AGAINST**
<u>**THE TRUSTEE DEFENDANTS ON BEHALF OF THE CLASS**</u>

181.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

182.    As the Funds directors, the Trustee Defendants had a fiduciary duty to the Funds and Funds investors to supervise and monitor the Investment Adviser Defendants.

183.    The Trustee Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" in exchange for "shelf-space"; and (4) charging excessive and improper commission payments to brokers.

184.     Plaintiffs and the Class have been specifically injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

185.     Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT IX

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS ON BEHALF OF THE CLASS

186.     Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

187.     At all relevant times herein, the brokerages, such as Morgan Stanley, Smith Barney, and Wachovia, among others, that sold the Funds had fiduciary duties of loyalty to their clients, including Plaintiffs and other members of the Class.

188.     Defendants knew or should have known that the brokerages had these fiduciary duties.

189.     By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions from ADAM of America in exchange for aggressively pushing the Funds, and by failing to disclose the receipt of such fees, the brokerages breached their fiduciary duties to Plaintiffs and the other members of the Class.

190.     Defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless perpetrated the fraudulent scheme alleged herein.

191.    Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiffs and the other members of the Class.  By participating in the brokerages' breaches of fiduciary duties, Defendants are liable therefor.

192.    As a direct, proximate and foreseeable result of Defendants' knowing participation in the brokerages' breach of fiduciary duties, Plaintiffs and the Class have suffered damages.

193.    Because Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, Defendants are liable for punitive damages in an amount to be determined by the jury.

## UNJUST ENRICHMENT CLAIMS

### COUNT X

**AGAINST ALL DEFENDANTS FOR
UNJUST ENRICHMENT ON BEHALF OF THE CLASS**

194.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

195.    Defendants have benefited from their unlawful acts through the excessive and improper fees they charged and received from Plaintiffs and the other members of the Class.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and the other members of the Class and retained by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding the Funds rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

E. Ordering an accounting of all the Fund related fees, commissions, directed brokerage and Soft Dollar payments;

F. Ordering restitution of all unlawfully or discriminatorily-obtained fees and charges;

G. Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure that Plaintiffs and the Class have an effective remedy;

H. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

I. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

**HURWITZ, SAGARIN & SLOSSBERG, LLC**


By: _____
J. Daniel Sagarin (CT 04289)
David A. Slossberg (CT 13116)
Brian C. Fournier (CT 16272)
147 North Broad Street
P.O. Box 112
Milford, CT 06460
Tel.:    (203) 877-8000

*Liaison Counsel*

**MILBERG WEISS BERSHAD &**
   **SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Kim E. Levy
Michael R. Reese
One Pennsylvania Plaza
New York, NY 10119
Tel.:    (212) 594-5300

*Co-Lead Counsel*

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

*Co-Lead Counsel*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center- Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

**WEISS & YOURMAN**
Joseph H. Weiss
551 Fifth Avenue
New York, New York  10176
(212) 682-3025

**MURRAY, FRANK & SAILER LLP**
Brian P. Murray
Eric J. Belfi
275 Madison Avenue
New York, New York  10016
(212) 682-1818

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
Tel.:    (610) 667-7706


**SHEPARD, FINKELMAN, MILLER
  & SHAH**
Patrick A. Klingman
1 Lewis St.
Hartford, CT 06103-2509

**GLANCY BINKOW & GOLDBERG LLP**
Michael M. Goldberg
1801 Avenue of the Stars
Suite 311
Los Angeles, California  90067
(310) 201-9150

*Additional Plaintiffs' Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a copy of the foregoing was mailed, first class mail, on November 3, 2004 to:

Charles W. Pieterse
Whitman Breed Abbott & Morgan, LLC
100 Field Point Road
Greenwich, Connecticut  06830

Michele Cerezo-Natal
John C. Ertman
45 Rockefeller Plaza
New York, New York  10111-0087

Michael T. Marcucci
Harvey J. Wolkoff
Ropes & Gray, LLP
One International Place
Boston, Massachusetts  02110-2624

*Counsel for Allianz Dresdner Asset Management of America, L.P.; Allianz of America, Inc;, Allianz Dresdner Asset Management of America Holdings, Inc;, PIMCO Advisors Fund Management, LL; PIMCO Equity Advisors, LLC, Cadence Capital Management; NFJ Investment Group, L.P.;  Nicholas-Applegate Capital Management, LLC; Pacific Investment Management Company, LLC; and RCM Capital Management, LLC*

Stuart D. Rosen
Bingham McCutchen, LLP
One State Street
Hartford, Connecticut  06103

*Counsel for E. Philip Cannon; Donald P. Carter; Gary A. Childress; Theodore J. Coburn; W. Bryant Stooks; PKMCO PEA Value Fund; PIMCO PEA Renaissance Fund; PIMCO PEA Growth and Income Fund; PIMCO PEA Growth Fund; PIMCO PEA Target Fund; PIMCO PEA Opportunity Fund; PIMCO PEA Innovation Fund; PIMCO NFJ Large-Cap Value Fund; PIMCO NFJ Dividend Value Fund; PIMCO NFJ Small-Cap Value Fund; PIMCO CCM Capital Appreciation Fund; PIMCO CCM Mid-Cap Fund; PIMCO RCM Large-Cap Growth Fund; PIMCO RCM Tax-Managed Growth Fund; PIMCO RCM Mid-Cap Fund; PIMCO RCM Global Small Cap Fund; PIMCO RCM International Growth Equity Fund; PIMCO RCM Global Healthcare Fund; PIMCO RCM Biotechnology Fund; PIMCO RCM Global Technology Fund; PIMCO Asset Allocation Fund; PIMCO NACM Value Fund; PIMCO NACM Flex-Cap Fund; PIMCO NACM Growth Fund; PIMCO NACM International Fund; PIMCO NACM Pacific Rim Fund*

Katherine A. Burroughs
Robert E. Grady
Dechert LLP
90 State House Square, 12th Floor
Hartford, Connecticut  06103

David A. Kotler
Dechert LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ  08543-5218

Arthur Newbold
Dechert LLP
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA  19103


*Counsel for PIMCO StocksPLUS Fund; PIMICO StocksPLUS Fund; PIMCO StocksPLUS Total Return Fund; PIMCO Short Term Fund; PIMCO Low Duration Municipal Income Fund; PIMCO Money Market Fund; PIMCO Total Return Fund; PIMCO Long-Term U.S. Government Fund; PIMCO GNMA Fund; PIMCO Total Return Mortgage Fund; PIMCO Diversified Income Fund; PIMCO High Yield Fund; PIMCO Global Bond Fund II; PIMCO Foreign Bond Fund; PIMCO Emerging Markets Bond Fund; PIMCO Municipal Bond Fund; PIMCO California Intermediate Muni Bond Fund; PIMCO California Muni Bond Fund; PIMCO New York Muni Bond Fund; PIMCO Real Return Fund; PIMCO Commodity Real Return Strategy Fund; PIMCO All Asset Fund; PIMCO International StocksPLUS TR Strategy Fund; PIMCO Real Estate Return Strategy Fund.*


_____
Brian C. Fournier