# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re ALLIANZ DRESDNER MUTUAL FUNDS FEE LITIGATION | MASTER FILE: 04-cv-0280 (CFD) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | FEBRUARY 18, 2005 |

## JOINT MEMORANDUM OF LAW OF THE ALLIANZ DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS ALL COUNTS AS AGAINST THEM IN THE CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................5

A.   The Parties ................................................................................................5

    **1.**   The Plaintiffs................................................................................5
    **2.**   The Defendants .............................................................................6

        **a.**   The MMS Defendants........................................................6
        **b.**   The PIMS Defendants........................................................7
        **c.**   Distributor Defendant ........................................................8
        **d.**   Parent Entity Defendants ...................................................8

B.   Plaintiffs' Allegations ................................................................................9

ARGUMENT .......................................................................................................10

I.   BASIC THRESHOLD FAILURES OF THE COMPLAINT.............................10

    A.   The Regulatory Settlements Do Not Support Plaintiffs' Claims of
        Shareholder Harm From "Directed Brokerage" .......................................10

        1.   Limited Nature of the Settlements...............................................11
        2.   No Monetary Harm to the Affected Funds. ..................................12
        3.   MMS Trustees Were Not Involved...............................................13

    B.   Plaintiffs' Conclusory Pleading Regarding Rule 12b-1 Fees Fails To State
        A Claim....................................................................................................13

    C.   Plaintiffs' Allegations with Respect to Revenue Sharing Fail to State a
        Claim Because Such Payments Are Lawful ...............................................13

    D.   Plaintiffs' Conclusory Allegations Regarding "Excessive Brokerage
        Commissions" And "Soft Dollars" Do Not State A Claim .......................14

    E.   Plaintiffs Fail to Plead Any Specific Allegations of Misconduct Against
        PIMCO, NFJ, RCM, NACM, and CCM.......................................................16

COUNT BY COUNT ARGUMENTS FOR DISMISSAL........................................17

II.   PLAINTIFFS' § 34(b) CLAIM SHOULD BE DISMISSED ............................17

A.      There is No Private Right of Action Under § 34(b) ..............................................18

B.      Even Assuming A Private Right of Action Existed, Plaintiffs Cannot Assert
        a Holder Class Action For Misrepresentations and Omissions Under § 34(b)......18

III.    PLAINTIFFS' COUNT II UNDER § 36(a) OF THE ICA SHOULD BE
        DISMISSED ..............................................................................................................22

A.      There is No Private Right of Action under § 36(a).................................................22

        1.      Supreme Court and Second Circuit doctrine requires that Congress
                unambiguously express its intent to create a private right of action
                in the statute itself in order for Courts to infer the existence of such
                a remedy..........................................................................................................22

        2.      Far from evidencing a legislative intent to establish a private right of
                action, the language and structure of § 36(a) demonstrate that the
                provision empowers the SEC alone to bring suit.........................................25

B.      Even Assuming a Private Right of Action Were to Exist Under Section 36(a),
        Plaintiffs' § 36(a) Claim Must Be Dismissed Because It is a Derivative Claim
        and Plaintiffs' Failure to Make a Demand on the Funds' Trustees Should Not
        be Excused ..............................................................................................................27

        1.      Under Massachusetts Law, Plaintiffs' § 36(a) Claim is Derivative ..........27
        2.      Plaintiffs' Failure to Make a Demand Should Not be Excused.................30

                (a)     Massachusetts Law Requires That Demand Be Made Before
                        Derivative Litigation Is Commenced...............................................31
                (b)     Plaintiffs' Failure to Demonstrate "Demand Futility"...................32

C.      The Nominal Defendant PIMS Funds Must Be Dismissed From All
        Derivative Claims As Plaintiffs Do Not Allege Demand Futility With
        Respect to the PIMS Trustees ................................................................................38

IV.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER § 36(b) OF THE
        INVESTMENT COMPANY ACT............................................................................38

A.      Plaintiffs' Allegations of Improper 12b-1 Fees Fail to State a Claim
        Under § 36(b)..........................................................................................................41

B.      Plaintiffs Fail to State a Claim Under § 36(b) for "Inflated
        Management Fees" ..................................................................................................46

C.      Plaintiffs Cannot Maintain § 36(b) Claims for Fees Paid on Funds Whose Shares They Do Not Own................................................................47

V.      PLAINTIFFS' CLAIM UNDER § 48(a) OF THE INVESTMENT COMPANY ACT SHOULD BE DISMISSED ........................................................48

VI.     PLAINTIFFS' CLAIM UNDER § 215 OF THE INVESTMENT ADVISERS ACT SHOULD BE DISMISSED.............................................................50

A.      Plaintiffs Have Not Plead Adequately that Demand on the Trustees is Excused ........................................................................................51

B.      Plaintiffs Fail to Plead A Section 206 Violation With Particularity Against Each Investment Adviser Defendant.......................................51

C.      Plaintiffs Fail to State a Claim for Rescission Under § 215 of the IAA................53

VII.    PLAINTIFFS' STATE LAW CLAIM FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED ........................................................54

A.      Plaintiffs' Breach of Fiduciary Duty Claim Is Derivative......................................55

B.      To the Extent that Plaintiffs' Claim Is Based on Alleged Misrepresentations And Omissions In The Funds' Prospectuses  and SAIs, Their Claim Is Also Pre-Empted by SLUSA........................................................................55

1.      Covered Class Action ..............................................................56
2.      Claim Based on State Law ........................................................56
3.      Covered Security.......................................................................56
4.      The Misrepresentation or Omission Is In Connection With the Purchase or Sale of a Security ..................................................56

VIII.   PLAINTIFFS' CLAIM FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY BY THE BROKERS SHOULD BE DISMISSED.........................58

A.      Plaintiffs Do Not Expressly Allege That They Purchased Shares Through Any Particular Broker, and Thus Lack Standing to Bring This Claim..................58

B.      This Claim is Pre-Empted by SLUSA ........................................................59

IX.     PLAINTIFFS' CLAIM UNDER THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA") SHOULD BE DISMISSED..................................60

X.      PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT SHOULD BE DISMISSED.....61

XI.   PLAINTIFFS DO NOT HAVE STANDING TO MAINTAIN ACTIONS ON
      BEHALF OF FUNDS OR CLASSES OF SHARES IN WHICH THEY WERE NOT
      INVESTORS OR FOR HARM TO SHAREHOLDERS OF THOSE FUNDS OR
      CLASSES OF SHARES ............................................................................................61

      A.   Constitutional Standing...........................................................................62
      B.   Direct Claims ...........................................................................................63
      C.   Derivative Claims .....................................................................................65

CONCLUSION.......................................................................................................................67

## **TABLE OF AUTHORITIES**

## **CASES**

Page(s)

*ABF Capital Management v. Askin Capital Management*, 957 F. Supp. 1308 (S.D.N.Y. 1997).............................................................................61

*Alexander v. Sandoval*, 532 U.S. 275 (2001)................................................ passim

*Allen v. Wright*, 468 U.S. 737 (1984) ...............................................................62

*Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70 (S.D.N.Y. 1986) .........................63

*In re Bank of Boston Corp. Sec. Litigation*, 762 F. Supp. 1525 (D. Mass. 1991) .............63

*In re Bank of N.Y. Derivative Litigation*, 320 F.3d 291 (2d Cir. 2003).......................65

*Bartlett v. New York, N.H. & H.R. Co.*, 109 N.E. 452 (Mass. 1915)...................32, 33

*Benak v. Alliance Capital Management L.P.*, No Civ.A 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ...........................................................40, 46

*Bernstein v. Somekh*, 452 F. Supp. 1373 (S.D.N.Y. 1978)................................66

*Bessette v. Bessette*, 434 N.E.2d 206 (Mass. 1982)..........................................28

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)........................19

*Chamberlain v. Aberdeen Asset Management Ltd.*, No. 02 CV 5870 (E.D.N.Y. January 21, 2005).....................................................................25, 26

*Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994)................21

*Cinicolo v. Morgan Stanley Dean Witter & Co.*, No. 01 Civ. 6940, 2004 WL 2848542 (S.D.N.Y. Dec. 9, 2004) ...........................................................55

*Cohen v. Citibank, N.A.*, 954 F. Supp. 621 (S.D.N.Y. 1996) ............................54

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005)........................................................................56, 57, 58

*Demoulas v. Demoulas Super Markets, Inc.*, No. 033741BLS, 2004 WL 1895052 (Mass. Super. Ct. Aug. 2, 2004) ..................................................35

*Dorchester Investors v. Peak Intern. Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001)............18

*Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99 Civ. 11541 DC, 2000 WL 1036034 (S.D.N.Y. July 27, 2000) ................................................................16

*Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105 (D.R.I. 1990) ....................49

*In re Dreyfus Aggressive Growth Mutual Fund Litigation*, No. 98 Civ. 4318 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000) ..............19

*Dunphy v. Traveller Newspaper Assoc.*, 16 N.E. 426 (Mass. 1888) ...............................35

*In Re Eaton Vance Corp. Sec. Litigation*, 219 F.R.D. 38 (D. Mass. 2003).....................64

*Fogel v. Chestnutt*, 533 F.2d 731 (2d Cir. 1975)...........................................................23

*Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981)...........................................................23

*Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982)........................................................................................... passim

*Gilman v. Gilman*, No. 508736, 1990 WL 283219 (Conn. Super. Aug. 29, 1990)...........61

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ..........................................................23

*Gordon v. Buntrock*, No. 00 CV. 303, 2000 WL 556763 (N.D. Ill. Apr. 28, 2000)..........57

*Green v. Fund Asset Mgmt.*, 286 F.3d 682 (3d Cir. 2002) ..............................................40

*Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486 (N.D. Ill. 1999) ..........................19, 31

*Greenspun v. Lindley*, 330 N.E.2d 79 (N.Y. 1975) ........................................................33

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996)...............................................................37

*Grossman v. Johnson*, 89 F.R.D. 656 (D. Mass. 1981) ...................................................33

*Grossman v. Johnson*, 674 F.2d 115 (1st Cir. 1982) .......................................................32

*Hardy v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 189 F. Supp. 2d 14 (S.D.N.Y. 2001)..........................................................................................57

*Harhen v. Brown*, 730 N.E.2d 859 (Mass. 2000) ...............................................32, 36, 37

*Heit v. Baird*, 567 F.2d 1157 (1st Cir. 1977)..................................................................37

*Hurley v. Federal Deposit Insurance Corp.*, 719 F. Supp. 27 (D. Mass. 1989)...............29

*Int'l Primate Protection League v. Administrations of Tulane,*
    500 U.S. 72 (1991)..................................................................................62

*Jackson v. Stuhlfire,* 547 N.E.2d 1146 (Mass. App. Ct. 1990).............................28

*Jaghory v. New York State Department of Education,* 131 F.3d 326 (2d Cir. 1997) ........62

*Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030 (2d Cir. 1992).......................53

*Kamen v. Kemper Finance Services,* 500 U.S. 90 (1991) .............................27, 31

*In re Kauffman Mutual Fund Actions,* 479 F.2d 257 (1st Cir. 1973)....................37

*Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970)............................65

*Kona Enterprises Inc., v. Estate of Bishop,* 179 F.3d 767 (9th Cir. 1999) ...................66

*Krantz v. Prudential Investments Fund Management LLC,* 305 F.3d 140
    (3d Cir. 2002)............................................................................35, 40

*Krinsk v. Fund Asset Management, Inc.,* 875 F.2d 404 (2d Cir. 1989)....................38

*Lapidus v. Hecht,* 232 F.3d 679 (9th Cir. 2000) .............................................30

*Lessler v. Little,* 857 F.2d 866 (1st Cir. 1988) ..............................................49

*Lewis v. Casey,* 518 U.S. 343 (1996)..........................................................62

*Lipsky v. Commonwealth United Corp.,* 551 F.2d 887 (2d Cir. 1976)....................11

*Lockery v. O'Hara,* No.CV000504936S, 2002 WL 1837774
    (Conn. Super. July 1, 2002) ...........................................................61

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .......................................64

*In re M-L Lee Acquisition Fund II,* 848 F. Supp. 527 (D. Del. 1994)....................50

*Manson v. Stacescu,* 11 F.3d 1127 (2d Cir. 1993)...........................................29

*Manzo v. Rite Aid Corp., No. Civ.A. 18451-NC,* 2002 WL 31926606
    (Del. Ch. 2002), *aff'd, 825 A.2d 239 (Del. 2003)* ...........................20, 21

*McLachlan v. Simon,* 31 F. Supp. 2d 731 (N.D. Cal.1998)................................22

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litigation*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................................18, 19

*In re Merrill Lynch Focus Twenty Fund Investment Co. Act Litigation*,
   218 F.R.D. 377 (E.D.N.Y. 2003) ...................................................................................25

*Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76 (2d Cir. 1985) .........................40

*Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861 (2d Cir. 1990) ...............40, 42

*Migdal v. Rowe Price-Fleming International, Inc.*, 248 F.3d 321
   (4th Cir. 2001) .............................................................................................. passim

*Mozes v. Welch*, 638 F. Supp. 215 (D. Conn. 1986) ..........................................................37

*Municipal Light Co. of Ashburnham v. Commonwealth*, 608 N.E.2d 743
   (Mass. App. Ct. 1993) ...................................................................................................29

*In re Mutual Fund Litigation*, 320 F. Supp. 2d 352 (D. Md. 2004) .........................56, 57

*Nekritz v. Canary Capital Partners*, 2004 WL 1462035 (D.N.J. Jan. 12, 2004)...............57

*Nenni v. Dean Witter Reynolds, Inc.*, No. 98-12454-REK,
   1999 U.S. Dist. LEXIS 23351 (D. Mass. Sept. 29, 1991) ...........................................65

*In re Nuveen Fund Litig.*, No. 94 C 360, 1996 WL 328006
   (N.D. Ill. Jun. 11, 1996) ................................................................................................23

*Olmsted v. Pruco Life Insurance Co. of New Jersey*, 283 F.3d 429
   (2d Cir. 2002)................................................................................................... passim

*Palmer v. Thomas & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286
   (D. Conn. 1979) .............................................................................................................54

*People of the State of California v. PA Distributors LLC*, No. 04-AS-03699
   (Cal. Super. Ct. Sept. 15, 2004) ...................................................................................12

*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000) .................................................63

*Press v. Quick & Reilly*, 218 F.3d 121 (2d Cir. 2000)........................................................14

*Prof'l Mgmt Associate Inc. Employees Profit Sharing Plan v. KPMG LLP*, 335
   F.3d 800 (8th Cir. 2003) ...............................................................................................59

*Raines v. Byrd*, 521 U.S. 811 (1997) .................................................................................64

*Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196 (S.D.N.Y. 1991) ......................... 63

*Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986) ......................... 29

*Riley v. Merrill Lynch*, 292 F.3d 1334 (11th Cir. 2002) ......................... 57

*Russell v. Dean Witter Reynolds*, 200 Conn. 172 (1986) ......................... 60

*San Leandro Emergency Medical Group v. Philip Morris Cos.*, 75 F.3d 801
    (2d Cir. 1996) ......................... 6

*Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985) ......................... 51

*Shahidi v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No.
    2:02CV483FTM29SC, 2003 WL 21488228 (M.D. Fla. Apr. 28, 2003) ......................... 52

*Simon v. E. Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) ......................... 63

*Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676 (S.D.N.Y. 1984) ......................... 54

*Solomon v. Armstrong*, 747 A.2d 1098 (Del. Ch. 1999) ......................... 36

*Southland Sec. Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353
    (5th Cir. 2004) ......................... 53

*Steadman v. SEC*, 450 U.S. 91 (1981) ......................... 51

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002) ......................... 28, 29, 50

*Strougo v. BEA Assoc.*, No. 98 Civ. 3725, 1999 WL 147737
    (S.D.N.Y. Mar. 18, 1999) ......................... 46

*Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997) ......................... 22

*In re TCW/DW North American Government Income Trust Securities Litigation*,
    941 F. Supp. 326 (S.D.N.Y. 1996) ......................... 40

*Transamerica Mortg. Advisers, Inc. v. Lewis*, 444 U.S. 11 (1979) ......................... 52, 53, 54

*Verkouteren v. Blackrock Fin. Mgmt. Inc.*, No. 98 Civ. 4673(WK),
    1999 WL 511411 (S.D.N.Y. July 20, 1999) ......................... 35, 40

*Verkouteren v. Blackrock Finance Management, Inc.*, 37 F. Supp. 2d 256
    (S.D.N.Y. 1999) ......................... 35

*Weiner v. Winters*, 50 F.R.D. 306 (S.D.N.Y. 1970) ......................... 65

*White v. Heartland High Yield Municipal Bond Fund*, 237 F. Supp. 2d 982
    (E.D. Wis. 2002) ............................................................................................18

*Williams v. Bank One Corp.*, No. 03 C8561, 2003 U.S. Dist. LEXIS 23522
    (N.D. Ill. December 15, 2003) ......................................................................64

*In Re WorldCom, Inc. Sec. Litigation*, 336 F. Supp. 2d 310 (S.D.N.Y. 2004) .................20

*Yampolsky v. Morgan Stanley Investment Advisers Inc.*,
    No. 03 Civ. 5710 (RO), 2004 WL 1065533 (S.D.N.Y. May 12, 2004) ..........39, 41, 42

*Young v. Nationwide Life Insurance Co.*, 2 F. Supp. 2d 914 (S.D. Tex. 1998)..................22

*Zerman v. Jacobs*, 510 F. Supp. 132 (S.D.N.Y. 1981), *aff'd, 672 F.2d 901 (2d
    Cir. 1981)* ....................................................................................................54

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 80a-2(a)(19) ..................................................................................34

§ 206 of the Investment Advisers Act ........................................................ passim

§ 215 of the Investment Advisers Act, 15 U.S.C. § 80b-15(b)..................... passim

§ 16(2) of the Investment Company Act ..........................................................34

§§ 26(f) and 27(i) of the Investment Company Act...........................................25

§ 34(b) of the Investment Company Act, 15 U.S.C. § 80a-33(b)................ passim

§ 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a) ................ passim

§ 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b)................ passim

§ 42 of the Investment Company Act, 15 U.S.C. § 80a-41 ...............................49

§ 48(a) of the Investment Company Act, 15 U.S.C. § 80a-47(a) ........10, 48,49, 50

§ 10(b) of the Securities Exchange Act ............................................................51

§ 28(e) of the Securities Exchange Act, 15 U.S.C. § 78bb(e)(1)........................15

§ 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc.............................53, 54

Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42- 110(a) *et seq*.................60

Fed. R. Civ. P. 12(b)(6) ...............................................................................6, 10

Fed. R. Civ. P. 9(b) ...................................................................................16, 52, 53

Fed. R. Civ. P. 23.1......................................................................................... passim

Mass. Gen. Laws ch. 156D, § 7.42 (2003) ......................................................31

Mass. Gen. Laws ch. 182, § 2B ......................................................................33

NASD Rule 2830 ..........................................................................................44

Rule 10b-10 of the Securities Exchange Act.....................................................14

Rule 10b-5 of the Securities Exchange Act.................................................. passim

Rule 12b-1 of the Investment Company Act ................................................................ passim

Securities Litigation Uniform Standards Act, 15 U.S.C. §§78bb(f)(1) *et seq* ........... passim

## **MISCELLANEOUS**

§ 5911 (2004) 12B William Meade Fletcher et al., Fletcher Cyclopedia
    of the Law of Private Corporations...................................................................28

Brian K. Reid and John D. Rea, *Mutual Fund Distribution
    Channels and Distribution Costs,* Investment Company
    Institute Perspective, Vol. 9/No. 3 (July 2003)............................................42

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    (2d ed. Supp.2000)..................................................................................62, 66

Sec. Act Rel. No. 5250 (May 9, 1972) .......................................................................15

Sec. Release No. 11414, 21 S.E.C. Docket 324, 1980 WL 20761(October 28,
    1980)..................................................................................................................13

The defendants Allianz Global Investors of America L.P. (f/k/a Allianz Dresdner Asset Management of America L.P.), Allianz of America, Inc., Allianz Global Investors of America Holding Inc. (f/k/a Allianz Dresdner Asset Management of America Holding Inc.), PA Fund Management LLC, PEA Capital LLC, Nicholas-Applegate Capital Management LLC, RCM Global Investors LLC, Pacific Investment Management Company LLC, Cadence Capital Management LLC, NFJ Investment Group L.P., and PA Distributors LLC (all of the foregoing defendants collectively the "Allianz Defendants") respectfully submit this Memorandum of Law in support of their Motion to dismiss the Consolidated Amended Complaint (the "Complaint").[1]

## PRELIMINARY STATEMENT

This action is brought on behalf of a purported class of all persons and entities who were "holders" of shares in 54 different mutual funds (the "Funds") during a four and a half year period. The named plaintiffs themselves were holders in only 3 nominal defendant funds at the time of the filing of the Complaint.[2] Nonetheless, the Plaintiffs seek to represent shareholders of 54 different mutual funds.

The Plaintiffs' Complaint contains 10 Counts asserted against 21 different defendants, including the investment advisers and parent entities, the distributor, and the Trustees of the Funds in question. Plaintiffs' Complaint is principally based on a regulatory settlement reached by three of the defendants in this action with the Securities and Exchange Commission ("SEC"), and a parallel regulatory settlement with the California State Attorney General ("California AG"), both announced in September 2004 (hereinafter collectively referred to as the "regulatory settlements"). The regulatory settlements relate to the securities industry practice of "directed

---

[1] The other defendants in the case are ten individuals who are present or former Trustees of the PIMCO Funds: Multi-Manager Series Trust (described herein). The Trustees are concurrently moving to dismiss all Counts in the Complaint as to them and are filing separate memoranda in support of their own motion to dismiss.

[2] All told, the Plaintiffs claim to have held shares in only 8 of the 54 Funds at any time during the alleged Class Period. *See* Compl. ¶¶ 18-21.

brokerage." Directed brokerage is the practice by which an adviser to a mutual fund, in deciding which broker-dealer to select to execute a particular securities trade, takes into account the broker-dealer's sale of the adviser's mutual funds. The settlements concerned seven (not 54) of the funds that are defendants in this action. The SEC alleged that by directing trades to certain specified broker-dealers — <u>even though always done at best execution</u> — the funds' investment adviser, sub-adviser and distributor had used fund "assets" to benefit themselves, by reducing the amounts they would otherwise have paid to the brokers in cash for promotion of fund sales.

The SEC determined that such arrangements were not adequately disclosed to the funds' Trustees or in the funds' public filings. Under the regulatory settlements, the investment adviser, sub-adviser, and distributor, without admitting or denying the allegations, agreed to pay $6.602 million directly into the seven affected funds (the amount based on the benefit to the distributor of the directed brokerage commissions at issue, plus interest). Importantly, the settlements made no allegations of any financial harm to any Fund, and the SEC specifically found that the trades had all been made at best execution.

Citing to the regulatory settlements, the Complaint alleges that Plaintiffs, as shareholders of 54 Funds, have direct claims against the Defendants for misappropriating assets – brokerage commissions – that belonged to the Funds. As shown below, Plaintiffs have no viable direct claims against the Defendants arising out of the regulatory settlements. As a threshold matter, assuming, *arguendo*, that the Funds incurred any damages as a result of directed brokerage (which they did not), Plaintiffs' claims are not direct shareholder claims, but rather, are classic derivative claims, for which Plaintiffs must first make a demand on the Funds' Trustees. Plaintiffs have inexcusably failed to make such a demand. Under the Investment Company Act and relevant corporate law, the independent Trustees of a mutual fund are intended to serve as

the guardians of shareholder rights and the principal "watchdogs" of the Funds' investment advisers and distributor. The Trustees are responsible for assessing, and have the right to first assess, whether the action being pursued by the Plaintiffs would be in the best interests of the Funds. By pleading derivative claims as direct claims, Plaintiffs are attempting to circumvent the demand requirement. The obligation of the Plaintiffs to make a demand is particularly compelling in this case, where millions of dollars have already been paid to the affected funds in connection with the regulatory settlements, and the regulators did not assert that there was any monetary harm to those funds.

In addition to claims based on "directed brokerage," Plaintiffs purport to bring a hodgepodge of other purportedly direct claims that are nowhere part of the regulatory settlements. Plaintiffs conclusorily allege — and without any factual support — that the Funds paid "excessive" commissions to broker-dealers, improperly used "soft dollars" to pay for overhead expenses or unnecessary research, and paid improper 12b-1 fees (i.e., fees for distribution of fund shares and servicing of fund shareholders). Plaintiffs also allege in rather pejorative terms that the investment adviser and distributor defendants made payments to broker-dealers out of their own pocket – not the Funds' assets – for the marketing and distribution of the Funds. But this practice, known as "revenue sharing," is unquestionably legal and in any event of no cognizable harm to the Funds or their shareholders. As with Plaintiffs' claims regarding directed brokerage, however, these claims are in actuality derivative claims, for which Plaintiffs must first make a demand on the Funds' Trustees (with the exception of Plaintiffs' claim under Section 36(b) of the Investment Company Act, further discussed below).

3

Based on the foregoing alleged conduct, the Complaint asserts five federal causes of action. Each of these five counts fails as a matter of law as to the investment adviser, distributor, and parent entity defendants and should be dismissed:

## Count I

Plaintiffs' claim under Section 34(b) of the Investment Company Act for alleged misrepresentations and omissions in the Funds' prospectuses about the allegedly improper distribution practices should be dismissed because there is no private right of action under Section 34(b) of the Investment Company Act. Indeed, even prior to the Supreme Court's recent decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), the weight of authority in the federal courts was that no private right of action existed under this statute; under the principles of *Sandoval* this statute, which speaks only to enforcement by the SEC, clearly does not provide for a private right of action. Moreover, even assuming such a private right of action existed under Section 34(b), Plaintiffs' claim is derivative, not direct, and Plaintiffs have inexcusably failed to make a demand on the Trustees.

## Count II

Plaintiffs' claim under Section 36(a) of the Investment Company Act alleging "breach of fiduciary duty" by the investment adviser and distributor defendants fails because, under the principles of *Sandoval*, there is clearly no private right of action under Section 36(a). Moreover, even assuming for the sake of argument that a private right of action existed under Section 36(a), Plaintiffs' claim is derivative, and Plaintiffs have inexcusably failed to make a demand on the Trustees.

## Count III

Plaintiffs' claim under Section 36(b) of the Investment Company Act, alleging that the Funds should not have been paying Rule 12b-1 distribution and servicing fees to brokers, also fails to state a claim. Plaintiffs make a blanket allegation that all Rule 12b-1 fees for all classes of shares within all 54 nominal defendant Funds should not have been charged because they do not benefit the Funds' shareholders. It is well established that to plead a claim under Section 36(b) Plaintiffs must allege with an appropriate degree of specificity that the fees charged were so disproportionately large as to have no reasonable relationship to the services provided -- mere conclusory allegations of "excessive fees" are inadequate to state a claim. Here, each of the Funds' Rule 12b-1 fees during the Class Period were approved by the Funds' independent Trustees, and were fully disclosed. Plaintiffs completely fail to plead that *any* 12b-1 fee was so disproportionately large as to have no reasonable relationship to the services provided.

## Count IV

Plaintiffs' claim of control person liability against defendant Allianz Dresdner Asset Management of America L.P. under Section 48(a) of the Investment Company Act fails because, among other things, Plaintiffs have not alleged any viable underlying Investment Company Act claims against those investment adviser and distributor defendants that are its indirect subsidiaries.

## Count V

Plaintiffs' claim under Section 215 of the Investment Advisers Act for rescission of the Funds' investment advisory contracts with their investment advisers is, as Plaintiffs concede, a derivative claim for which Plaintiffs inexcusably have failed to make a demand on the Funds' Trustees. Moreover, Plaintiffs have not pleaded any viable underlying violation of the Investment Advisers Act by any of the investment adviser defendants that would support rescission of the defendants' investment advisory contracts.

Plaintiffs also purport to allege four supplemental state law claims against the investment adviser defendants and distributor defendant. As shown below, these claims should be dismissed because: (1) they are pre-empted by the Securities Litigation Uniform Standards Act; (2) they are derivative claims pleaded in the guise of direct claims, as to which Plaintiffs have failed to make a demand on the Funds' Trustees; and/or (3) Plaintiffs have failed to adequately plead predicate facts supporting such claims.

Finally, Plaintiffs are not shareholders of at least 46 of the 54 Funds. Accordingly, all claims pertaining to funds in which Plaintiffs did not invest should be dismissed because Plaintiffs do not have standing to pursue claims with respect to mutual funds in which they are not shareholders.

## BACKGROUND

**A.    The Parties**

**1.    The Plaintiffs**

The Plaintiffs are four individuals who claim to have held shares during the alleged Class Period in 8 of the 54 Funds that are named as nominal defendants in the Complaint. Two of the

Plaintiffs further allege that they continue to own shares in 3 of the 8 funds; the other two

Plaintiffs do not allege that they continue to hold any shares. Plaintiffs seek to represent a class

consisting of all persons or entities who held shares in any of the nominal defendant Funds

during the purported Class Period of February 4, 1999 to November 17, 2003. Compl. ¶ 129.[3]

## 2.    The Defendants

### a.    The MMS Defendants

27 of the 54 Funds named as nominal defendants in the Complaint are called PIMCO

Funds: Multi-Manager Series Trust ("MMS Trust"). The MMS Trust is a registered investment

company organized as a Massachusetts business trust. *See* PIMCO Funds: Multi-Manager Series

April 1, 2003 Statement of Additional Information (hereinafter April 1, 2003 MMS SAI),

*available at* www.sec.gov/edgar, attached as Ex. A to the Declaration of John C. Ertman

(hereinafter "Ertman Decl.") at 99.

The MMS Trust is governed by its Board of Trustees. At all relevant times, the Board of

the MMS Trust has consisted of six "disinterested" (or "independent") Trustees and one

"interested" Trustee.[4] *See* April 1, 2003 MMS SAI at 45.[5] Plaintiffs name as Defendants nine

individuals who served as independent Trustees of the MMS Funds during part or all of the

alleged Class Period. Plaintiffs also name as a defendant Stephen J. Treadway, the lone

"interested" Trustee during the Class Period. *See id.*

---

[3]  In Paragraph 1 of the Complaint, Plaintiff allege that the Class Period extends from February 17, 1999 to November 17, 2003. Compl. ¶ 1. In Paragraph 129, Plaintiffs allege that the Class extends from February 4, 1999 to November 17, 2003. Compl. ¶ 129.

[4]  An "interested" Trustee under the Investment Company Act, which generally refers to a person who is also employed by or otherwise affiliated with a fund's investment adviser, discussed in Section III.B.2, *infra*. "Disinterested" trustees or "independent" trustees are those that are not interested persons under the ICA.

[5]  The Funds' prospectuses and Statements of Additional Information ("SAIs") are mandatory disclosure documents which are referred to by Plaintiffs and are integral to the Complaint, and thus may be considered in a Rule 12(b)(6) motion to dismiss. *See San Leandro Emergency Med. Group v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996).

Defendant PA Fund Management LLC ("PAFM") is the investment adviser to the MMS Funds, pursuant to an investment advisory agreement between PAFM and the MMS Trust. Defendants Nicholas-Applegate Capital Management LLC ("NACM"), PEA Capital LLC ("PEA"), RCM Capital Management LLC ("RCM"), Cadence Capital Management LLC ("CCM"), and NFJ Investment Group L.P. ("NFJ") each serve as sub-advisers to certain of the MMS Funds; in other words, PAFM has sub-contracted the investment management functions to these firms, which actually manage the MMS Funds' day-to-day operations, subject to the general oversight of PAFM and the MMS Board. *See* April 1, 2003 MMS SAI at 57.

**b.    The PIMS Defendants**

The remaining 27 of the 54 Funds named as nominal defendants are called PIMCO Funds: Pacific Investment Management Series ("PIMS Trust"). The PIMS Trust is a registered investment company that is organized as a Massachusetts business trust. *See* PIMCO Funds: Pacific Investment Management Series Statement of Additional Information (March 13, 2003) (hereinafter March 13, 2003 PIMS SAI) at 71, attached as Ex. B to the Ertman Decl. The PIMS Trust has a 6-member Board of Trustees, which at all relevant times has consisted of 4 independent Trustees and 2 interested Trustees. The PIMS Trustees are not named as defendants in the Complaint.[6]   The investment adviser to the PIMS Funds is defendant Pacific Investment Management Company LLC ("PIMCO").

Plaintiffs' claims concerning directed brokerage, excessive brokerage commissions, and improper use of "soft dollars" (*i.e.*, purchases of services with brokerage commissions) would appear to be directed against the MMS Trust, which consists of funds that invest primarily in equities, and which generate such commissions. *See generally* April 1, 2003 MMS SAI at 1-2.

---

[6] The sole exception is defendant Philip Cannon, who is both an Independent MMS Trustee and an Independent PIMS Trustee, but appears to have been named as defendant in this action solely in his capacity as an MMS Trustee.

In contrast, the PIMS Trust consists primarily of fixed-income funds, which do not generate such commissions. *See generally* March 13, 2003 PIMS SAI at 1-29. While the Complaint names the PIMS Funds as nominal defendants and PIMCO, the PIMS Funds' investment adviser, as a defendant, these entities were not named by the regulators as part of the regulatory settlements and the Complaint is completely devoid of any specific allegations of any purported "wrongdoing" within any of the PIMS Funds, by PIMCO or otherwise.

**c.** **Distributor Defendant**

Defendant PA Distributors LLC ("PAD") serves as the principal underwriter and distributor for the funds in both the MMS Trust and the PIMS Trust, pursuant to distribution agreements entered into with the Trusts. *See* April 1, 2003 MMS SAI at 66; March 13, 2003 PIMS SAI at 46.[7] As Distributor, PAD is responsible for the sales and marketing of the shares of the funds within those Trusts.

**d.** **Parent Entity Defendants**

Plaintiffs name as a defendant Allianz Dresdner Asset Management of America L.P. ("ADAM").[8] The investment adviser defendants and PAD are indirect subsidiaries or affiliates of ADAM. Plaintiffs also name as defendants in the Complaint two shareholders of ADAM, Allianz Dresdner Asset Management of America Holding, Inc. and Allianz of America, Inc., but do not expressly assert any claims against them.[9]

---

[7] This distribution arrangement continues to be in force. *See* PIMCO Funds: Multi-Manager Series Statement of Additional Information (November 1, 2004) at 70, *available at* www.sec.gov/edgar, attached as Ex. C to Ertman Decl. (hereinafter "November 1, 2004 MMS SAI"); PIMCO Funds: Pacific Investment Management Series Statement of Additional Information (November 24, 2004) at 49, *available at* www.sec.gov/edgar, attached as Ex. D to Ertman Decl. (hereinafter "November 24, 2004 PIMS SAI").

[8] ADAM is now known as Allianz Global Investors of America L.P. ("AGI"). For ease of reference, AGI will be referred to as ADAM in this Memorandum.

[9] Because Plaintiffs make no allegations or claims whatsoever against Allianz Dresdner Asset Management of America Holding, Inc. or Allianz of America, Inc., both defendants should be dismissed entirely from this action.

**B.**     **Plaintiffs' Allegations**

In their Consolidated Complaint, Plaintiffs make conclusory, non-specific allegations that

the investment adviser defendants and/or PAD engaged in several different categories of

purportedly improper conduct, including:

(1)     **Directed Brokerage:** Citing the regulatory settlements, Plaintiffs allege that the "Defendants" allegedly participated in "shelf-space programs" with brokerage houses whereby, in exchange for the brokerage houses' marketing of the Funds to investors, Defendants directed brokerage business in the Funds' investment portfolios to such brokerage houses (Compl. ¶¶ 55–58). Plaintiffs omit to state that the regulatory settlements found that such trades were all made at best execution, and that no monetary harm to the MMS Funds was even alleged;

(2)     **Excessive Commissions:** Defendants allegedly paid brokerage houses excessive brokerage commissions for portfolio trading as part of shelf-space programs—but again omit to state that the regulatory settlements found no such excessive commissions, but rather confirmed that all trades were done at best execution (Compl. ¶¶ 88-89, 94, 102-104);

(3)     **"Revenue Sharing":** Defendants made cash payments out of the Defendants' own assets (and not the Funds' assets) to brokerage houses to participate in shelf-space programs (Compl. ¶ 59);

(4)     **Improper "Soft Dollar" Payments:** Defendants allegedly paid excessive brokerage commissions in exchange for broker-dealers providing Defendants with "overpriced computer hardware or software" or unnecessary research (Compl. ¶¶ 107-109); and

(5)     **Improper Rule 12b-1 Fees:** Defendants caused the Funds to pay improper Rule 12b-1 fees for distribution-related expenses because there was "no reasonable likelihood" such fees would benefit the Funds because "any economies of scale achieved by marketing of the Funds were not passed on to Fund investors" (Compl. ¶¶ 95-101).

Plaintiffs further allege that the prospectuses and Statements of Additional Information

("SAIs") of the Funds during the Class Period failed to disclose the foregoing allegedly improper

conduct, rendering those filings "false and misleading." Compl. ¶¶ 119-128.

Plaintiffs contend that as a result of the alleged foregoing conduct, the Funds'

shareholders incurred "millions of dollars" in damages. Compl. ¶ 147.

--Plaintiffs allege six different Counts against PAD, for violations of Sections 36(a), 36(b), and 34(b) of the Investment Company Act, violations of the Connecticut Unfair Trade Practices Act, aiding and abetting brokers' breaches of fiduciary duty, and unjust enrichment.

--Plaintiffs allege the same six Counts against the investment adviser defendants, plus a Count for breach of common law fiduciary duty and a Count for rescission of the investment adviser defendants' investment advisory agreements under Section 215 of the Investment Advisers Act. Plaintiffs concede that their Investment Advisers Act Count is derivative, but allege that making a demand on the Trustees of the Funds would be futile. Compl. ¶ 110.

--Plaintiffs allege one Count against ADAM under Section 48(a) of the Investment Company Act for alleged "control person" liability.

The investment adviser, distributor and parent entity defendants now move to dismiss the Complaint as to them pursuant to Rule 12(b)(6) for failure to state a claim and/or Rule 23.1 for failure to make a demand on the Funds' Trustees.

## ARGUMENT

## I. BASIC THRESHOLD FAILURES OF THE COMPLAINT

### A. The Regulatory Settlements Do Not Support Plaintiffs' Claims of Shareholder Harm From "Directed Brokerage"

Plaintiffs erroneously claim that the regulatory settlement between certain of the Defendants and the SEC and the parallel settlement with the California AG show that Defendants have been "condemned" by government regulators for "kickbacks" that give rise to direct claims by fund shareholders. Compl. ¶ 55. The Complaint completely mischaracterizes the regulatory settlements in multiple respects. The settlements do not condemn any Defendant for kickbacks, and do not support any viable causes of action by the Plaintiffs.

1.    ***Limited Nature of the Settlements***.  The SEC settlement on its face was a

settlement of an administrative proceeding against only three of the 21 Defendants named in this

action -- PAFM, PEA and PAD.  *See re PA Fund Management LLC, PEA Capital LLC and PA

Distributors LLC*, SEC Release No. 34-50384, Release No. IA-2295, Release No. IC-26598

(Sept. 15, 2004), *available at* www.sec.gov/litigation/admin/34-50384.pdf ("*SEC Order*")

attached as Ex. E to Ertman Decl.  The SEC settlement narrowly focuses on "shelf space"

arrangements entered into by PAD between 2000 and 2003 with brokerage houses that involved

directed brokerage.  As summarized by the SEC, the SEC settlement was reached in the context

of the following allegations:[10]

--    PAD allegedly entered into arrangements with nine broker-dealers for "shelf space" arrangements, *i.e.* the broker-dealers promised increased visibility for the Funds within the broker-dealers' distribution systems. (*SEC Order* ¶¶ 4, 8-9.)

--    PAD's shelf space arrangements were paid by PAD principally in cash, from its own assets.  However, some arrangements were satisfied by PEA's directing brokerage commissions on securities transactions on those MMS Funds that were sub-advised by PEA (not, as the Consolidated Complaint implies, all 54 of the Funds). (*SEC Order* ¶¶ 8, 11.)

--    According to the SEC, through the use of directed brokerage, PAD partially avoided using its own cash assets to pay for shelf space.  According to the SEC, even though done at best execution and thus without harm to the Funds, brokerage commissions are a fund asset, and when directed to reduce the out-of-pocket expenses of PAD, created a conflict of interest that should have been disclosed to the Board of Trustees of the MMS Funds. (*SEC Order* ¶ 5.)

The SEC's position was that, based on the foregoing conduct, PAFM, PEA and PAD

were liable under various provisions of the ICA, IAA and the Securities Exchange Act of 1934

(the "Exchange Act"), provisions that are enforceable only by the SEC and which do not afford

private litigants any private right of action.  (*SEC Order* ¶ 36.)

---

[10] The various findings by the SEC set forth in the SEC settlement were neither admitted nor denied by PAFM, PEA and PAD.  It is well established that settlement agreements between a government agency and a private litigant are inadmissible in subsequent private litigation. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976).

Under the SEC settlement, PAFM, PEA and PAD agreed to pay $6,602,000 to the MMS Funds at issue, "based upon the amount of brokerage commissions from each fund used to pay for the Shelf Space arrangements."[11]

2.    *No Monetary Harm to the Affected Funds.*  The regulatory settlements do not claim any monetary harm was incurred by any Fund as a result of any of the alleged conduct by PAFM, PEA or PAD.  Indeed, the fact that brokerage was directed to one broker-dealer as opposed to another caused no cognizable damage to the Funds, because these were trades that the Funds were going to execute in the ordinary course anyway, and, as the SEC indicated, the trades were done at "best execution."  (*SEC Order* ¶¶ 5,11,19)  Thus, the settlement payments — representing the monetary value to PAD of the brokerage commissions the SEC alleged were directed to particular broker-dealers to earn credit for shelf-space payments — effectively amount to a windfall for the subject Funds. (*SEC Order* § IV.E).

In addition, the regulatory settlements nowhere mention or in any way support Plaintiffs' conclusory allegations that Defendants paid "excessive commissions," paid improper "soft dollars," wrongfully paid broker-dealers for shelf space arrangements from Defendants' own assets, or charged improper or unreasonable Rule 12b-1 fees.  To the contrary, as noted, the regulatory settlements indicate that all underlying portfolio securities trades were made at "best execution" — and thus were based on disclosure issues, not substantive economic harm to any of the MMS Funds. (*SEC Order* ¶¶ 5, 11, 19.)

---

[11]  In addition to paying $6.602 million in disgorgement, PAFM, PEA and PAD agreed to pay a $5 million civil penalty, and agreed to institute certain oversight measures.  In the related settlement reached by PAD with the California AG on a complaint filed against PAD only, PAD agreed to pay a $5 million civil penalty and $4 million to reimburse the State of California for investigatory costs.  *See People of the State of California v. PA Distributors LLC,* No. 04-AS-03699, Stipulation for Court Approval of Settlement and Entry of Final Judgment (Cal. Super. Ct. Sept. 15, 2004), *available at* http://caag.state.ca.us/newsalerts/2004/04-105_settlement.pdf; the Complaint in that action is hereinafter referred to as the "California Complaint" and is attached along with various California settlement materials as Ex. F to Ertman Decl.  The California AG alleged that PAD's failure to disclose the benefits it received from the shelf-space arrangements at issue violated California state securities law.

3.    *MMS Trustees Were Not Involved*.  Finally, while the Complaint makes

conclusory allegations that the MMS Trustees were complicit in wrongdoing, the SEC action

was premised in principal part on the alleged failure of PAFM, PEA, and PAD to disclose

directed brokerage arrangements to the MMS Trustees in their regular reporting to the Board.

(*SEC Order* ¶¶ 24-28.)

## B.    Plaintiffs' Conclusory Pleading Regarding Rule 12b-1 Fees Fails To State A Claim

Apart from their allegations regarding the regulatory settlements, Plaintiffs make a

blanket claim that the 54 nominal defendant Funds were wrongfully charged Rule 12b-1 fees, a

subject nowhere addressed in the regulatory settlements.  Each of the Funds has multiple share

classes which have different 12b-1 fees.  Thus, there are a multitude of different fees across 54

mutual funds.  However, beyond mere conclusory pleading and speculation, Plaintiffs fail to

plead any basis as to why any particular fee for any particular class was wrongful despite being

approved by the Funds' Trustees and fully disclosed.  Most importantly, nowhere do Plaintiffs

allege that the 12b-1 fees as to any fund were so disproportionate to the services rendered as to

indicate that Defendants breached their fiduciary duties with regard to compensation, a necessary

element of an excessive fee claim.

## C.    Plaintiffs' Allegations with Respect to Revenue Sharing Fail to State a Claim Because Such Payments Are Lawful

Plaintiffs misconstrue both the regulatory settlements and the Funds' disclosures with

respect to revenue sharing.  Revenue sharing refers to the longstanding mutual fund industry

practice of a fund's adviser or distributor making payments from *their own assets* (not fund

assets) to brokerage firms to distribute the funds' shares.  While the Complaint pejoratively

describes revenue sharing payments to brokers as "kickbacks," revenue sharing is

unquestionably legal.  *See, e.g,* Inv. Co. Act Release No. 11414, 21 S.E.C. Docket 324, 1980 WL

20761, at *9 (Oct. 28, 1980) ("[T]here is no indirect use of fund assets if an adviser makes distribution related payments out of its own resources"). In the regulatory settlements, for example, more than 85 percent of the payments for "shelf-space" programs came from the pocket of the Funds' Distributor, PAD, and not from the Funds in the form of brokerage commissions. *See SEC Order* at 11; *California Complaint* at 27. Neither regulatory action questioned the propriety of such cash payments. The *SEC Order* was entirely related to directed brokerage, and the California Complaint focused on the disclosure of PAD's participation in the shelf space programs at issue under California securities law, without challenging the underlying appropriateness or legality of revenue sharing payments made by PAD as part of these programs. *See SEC Order* at 24-35; *California Complaint* at 30.

Moreover, during the purported Class Period, the general disclosure of revenue sharing payments in mutual fund SEC filings was entirely adequate. The Complaint itself quotes the disclosure in the MMS SAI that indicates that the Distributor may make additional payments from its own assets to encourage sale of fund shares. Compl. ¶ 123; April 1, 2003 MMS SAI at 70. Before recent amendments to revenue sharing disclosure requirements (which were adopted after the Class Period), the Second Circuit ruled that disclosure similar to that in MMS's SAI was sufficient under Rule 10b-10 and Rule 10b-5. *See Press v. Quick & Reilly*, 218 F.3d 121, 127-28, 131 (2d Cir. 2000). Even in the recent wave of regulatory changes affecting the mutual fund industry, while new rules require more detailed disclosure by brokers and by mutual funds regarding revenue sharing, the SEC has not barred revenue sharing itself.

**D.    Plaintiffs' Conclusory Allegations Regarding "Excessive Brokerage Commissions" And "Soft Dollars" Do Not State A Claim**

With respect to the last categories of wrongful conduct alleged by Plaintiffs – excessive brokerage commissions and improper soft dollars – Plaintiffs allege that the "Prospectuses and

SAI of the funds failed to disclose . . . that the use of brokerage commissions to satisfy bilateral arrangements with brokers known as 'shelf space' programs violated Section 28(e) of the Exchange Act." Compl. ¶ 128(c). Plaintiffs also allege that the Investment Adviser Defendants improperly used "soft dollars" to pay for "unnecessary research" or "overhead costs" in violation of Section 28(e). Compl. ¶ 108-09.

Section 28(e) of the Exchange Act, 15 U.S.C. § 78bb(e)(1), provides a safe harbor for fund managers to select broker-dealers to execute portfolio commissions without mechanically being forced to choose the broker-dealer offering the lowest commission on that particular transaction. Section 28(e) permits a fund manager who "determine[s] in good faith that [the] amount of commission was reasonable in relation to the value of the brokerage and research services provided" to select a broker-dealer on a basis other than which broker is offering the lowest commission rate. 15 U.S.C. § 78bb(e)(1).[12] Plaintiffs cite no instance in which *any* of the Investment Adviser Defendants caused any Fund to pay any commissions falling outside this safe harbor. While Plaintiffs allege that the Defendants caused the funds to pay "excessive" commissions for "shelf space" or "unnecessary research" or "overhead costs," they cite no specific facts to support these allegations. They neither identify a single trade on which a supposedly excessive commission was paid, nor plead a single instance in which the Defendants did not determine, in good faith, that the commissions paid on their brokerage transactions were reasonable in light of the brokerage and research services provided.

---

[12] Factors the SEC has identified that may be taken into account in determining the "reasonableness" of a commission include the broker-dealer's execution capabilities, responsiveness, financial responsibility, administrative resources, commission rate, and value of research provided. *See* Sec. Act Rel. No. 9250 (May 9, 1972) attached as Ex. G to Ertman Decl. The MMS SAI, for example, discloses that "[A] Fund may pay higher commission rates than the lowest available when the Adviser or Sub-Adviser believes it reasonable to do so in light of the value of the brokerage and research services provided by the broker . . . ." April 1, 2001 MMS SAI at 88.

**E.    Plaintiffs Fail to Plead Any Specific Allegations of Misconduct Against PIMCO, NFJ, RCM, NACM, and CCM**

As described *supra*, the regulatory settlements involved only 3 of the 21 Defendants –

PAFM, PEA Capital and PAD.  As to the other 18 defendants not covered by the regulatory

settlements, Plaintiffs bear the burden of adducing *some* specific factual allegations against those

Defendants.  The Complaint manifestly fails to do so.  In fact, none of the other Defendants is

even mentioned by name in the remainder of the Complaint.

The Investment Adviser Defendants are separate entities that operate out of different

locations, as the Complaint acknowledges.  *See* Compl. ¶¶ 25-31.  The Funds' regulatory filings

demonstrate that the Investment Adviser Defendants have different employees, use different

investment management strategies, and manage different mutual funds.  *See, e.g.*, PIMCO Funds:

Multi-Manager Series Retail Prospectus (November 1, 2002) at 60-68, *available at*

www.sec.gov/edgar (hereinafter "November 1, 2002 MMS Retail Prospectus") attached as Ex. H

to Ertman Decl.; PIMCO Funds: Pacific Investment Management Series Prospectus for Class, A,

B and C Shares (February 28, 2003) at 1-2, 40-44, *available at* www.sec.gov/edgar (hereinafter

"February 28, 2003 PIMS Retail Prospectus") attached as Ex. I to Ertman Decl.  Yet Plaintiffs

make no attempt to distinguish between these distinct entities and make no specific allegations

against them.

All of Plaintiffs' Counts sound in fraud.  Under Rule 9(b) of the Federal Rules of Civil

Procedure, when pleading fraud against multiple defendants, a plaintiff must state with

particularity what each defendant did.  *See Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99

Civ. 11541 DC, 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) ("A plaintiff cannot satisfy

Rule 9(b) by filing a complaint in which defendants are clumped together in vague allegations.")

(citation omitted).  The Complaint contains no allegations on which a fraud claim can survive

16

against PIMCO, NACM, RCM, NFJ or CCM.  The Complaint is simply devoid of any specificity as regard to these Defendants.

Plaintiffs' failure to plead *any* facts or allegations specific to Defendants other than PEA, PAFM or PAD is fatal to their claims against those Defendants (and, as discussed, Plaintiffs do not plead viable causes of action against PEA, PAFM or PAD either).

*    *    *

Apart from the general legal infirmities of their claims as set forth above, Plaintiffs' claims fail to state a claim as a matter of law when analyzed count by count, as follows.

## COUNT BY COUNT ARGUMENTS FOR DISMISSAL

## II.    PLAINTIFFS' § 34(b) CLAIM SHOULD BE DISMISSED

In Count I, Plaintiffs allege that the Investment Adviser Defendants and PAD violated § 34(b) of the Investment Company Act.  Section 34(b) makes it unlawful for any person to make any untrue statement of a material fact in any registration statement, application, or other document filed pursuant to the Investment Company Act, or omit to state any fact necessary in order to prevent the statements made therein from being materially misleading.[13]  Plaintiffs allege that the Funds' prospectuses and SAIs failed to disclose the alleged wrongful acts

---

[13]  The full text of the provision is:

(b)  Untrue statements or omissions. It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.

15 U.S.C § 80a-33(b).